UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff<br>    v.<br>WILGEN ANIBAL BRITO-MELO,<br>and ANGEL RIVERA,<br>    Defendants | CRIMINAL ACTION<br>NO. 05-1684-PBS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WILGEN ANIBAL BRITO-MELO'S MOTION TO SUPPRESS**

The defendants, Wilgen Anibal Brito-Melo (hereinafter "Brito-Melo"), and Angel Rivera (hereinafter "Rivera), have been charged with conspiracy to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

**STATEMENT OF FACTS**

**THE INVESTIGATION**

In January, 2005, Drug Enforcement Administration Agents (hereinafter "Agents") and other law enforcement personnel, began investigating Rivera, Brito-Melo, and others, in relation to a drug operation in the Boston, Lynn, and Lawrence area of Massachusetts. [Ex. 1][1]

For approximately sixty days, from March 25, 2005, to May 19, 2005, DEA and other law enforcement officers monitored a federal wiretap of the Nextel telephone used by Brito-Melo, with the cellular telephone number of (617) 590-5820. [Ex. 2, p. 6][2] The

---

[1] Exhibits have been attached to this memorandum in numerical order and will be referenced as: [Ex. [number], p. [number] or [Ex. [number], ¶ [number]]. Exhibit 1 is the Search Warrant and Supporting Affidavit for Apartment # 705 at 290 Quarry Street in Quincy, Massachusetts.
[2] Exhibit 2 is the Search Warrant and Supporting Affidavit for Brito-Melo's residence located at 6123 Avalon Drive in Weymouth, Massachusetts.

1

Authorization for Interception Order was granted on March 25, 2005 and authorized a thirty day period for the interception of wire communications from Brito-Melo's cellular telephone. On April 22, 2005, this Order was extended for another thirty-day period. [Ex. 8][3] Agents' interception of telephone calls in April and May 2005, led Agents to believe that Brito-Melo and Rivera were in the drug trafficking business. [Ex. 2, p. 7]

As part of their investigation, Agents obtained the "Apartment Lease Agreement" for an apartment at 290 Quarry Street (hereinafter "the Quarry Street Apartment") and a Garage at 290 Quarry Street (hereinafter "the Garage"). [Ex. 2, p. 10] Both had been rented to Rivera since September 6, 2004. [Ex. 2, p. 10] Brito-Melo resided at an apartment located at 6123 Avalon Drive in Weymouth, Massachusetts, which he began leasing on November 18, 2004. [Ex. 2, p. 12] The Government believed the Quarry Street Apartment was the "stash house" for Brito-Melo and Rivera. [Ex. 2, p. 10]

In May, 2005, Agents rented Apartment 201 at 290 Quarry Street, which faces the parking lot, to facilitate their surveillance. [Ex. 2, p. 13] On May 2, 2005, Agents obtained an authorization order from the United States District Court for the District of Massachusetts to install a Global Positioning System ("GPS") device on an Oldsmobile Intrigue registered to "Jose Navarro" (Brito-Melo). On May 5, 2005, a "pole" camera was installed in apartment 201 and was positioned to view activity near the Garage. [Ex. 2, p. 13] During the two months (May 5 to July 7, 2005) agents monitored the Quarry Street Apartment with the "pole" camera, Rivera was seen entering and exiting the Quarry Street Apartment on numerous occasions, often with bags and/or suitcases. [Ex. 3][4]

---

[3] Exhibit 8 is a Drug Enforcement Administration Form-6 prepared by Agent O'Neil on April 27, 2005.
[4] Exhibit 3 is a Drug Enforcement Administration Form-6, prepared by Agent O'Neil on July 13, 2005.

On May 19, 2005, the wiretap was terminated. [Ex. 6][5] No drugs or money were seized during the period of the wiretap, nor were any arrests made. Thus, as of July 7, 2005, no more probable cause existed to search the defendants' vehicles and residences than existed on May 19, 2005, the date the wiretap was terminated. On July 7, 2005, with nothing more than a suspicion that the defendants were drug traffickers, Agents conducted a series of warrantless searches, unsupported by either valid consent or probable cause. At the time of the searches, Agents had no specific information, nor reasonable suspicion that drugs or related evidence would be found in any particular location or vehicle.

**THE ARREST**

On the morning of July 7, 2005, at approximately 5:49 AM, Agents reviewed a surveillance video tape that showed Rivera arriving at the Quarry Street Apartment in a blue Saab. [Ex. 3, ¶ 1] At 5:58 AM, the surveillance tape showed Rivera exiting the Garage with a "black, apparently heavy, gym bag." [Ex. 2, ¶ 33; Ex. 3] Later that evening, at approximately 9:32 PM, Agents observed Rivera return to the Quarry Street Apartment in the blue Saab. [Ex. 3, ¶ 3] Rivera was observed to be carrying a different bag, described as a "dark colored, square, apparently heavy bag." [Ex. 2, ¶ 34; Ex. 3]

On July 7, 2005, Agents observed the white Taurus that Rivera had been seen driving on previous multiple occasions, parked outside Brito-Melo's residence in Weymouth, Massachusetts. [Ex. 3, ¶ 4] At approximately 9:42 PM that night, Brito-Melo arrived at the Quarry Street Apartment driving the white Taurus. [Ex. 3, ¶ 4] Agents observed Rivera exit the apartment and take a white bag from the rear of the Saab. [Ex. 3, ¶ 4] Rivera then got into the Taurus. [Ex. 3, ¶ 4] Rivera operated the

---

[5] Exhibit 6 is a Drug Enforcement Administration Form-6, prepared by Agent O'Neil on May 31, 2005.

vehicle once they left the Quarry Street Apartment. [Ex. 3, ¶ 4] At that point, Agents instructed Trooper Kane of the Massachusetts State Police to stop the white Taurus. [Ex. 4][6] At 9:47 PM, Rivera was stopped by Trooper Kane. [Ex. 3, ¶ 5] The stop occurred less than five minutes after the two men left the Quarry Street Apartment,[7] after driving through the Furnace Brook Parkway Rotary, while gaining access to Route 93 South. [Ex. 2, p. 19] Trooper Kane later said that he stopped Rivera for "drifting into the breakdown lane twice" on Route 93 South. [Ex. 4] No citation was issued.[8]

After the stop and during a search of the motor vehicle allegedly consented to by Rivera, no contraband was found in the white bag or anywhere else. [Ex.1, p. 13] Law enforcement officers did, however, seize mail addressed to the Quarry Street Apartment and a Citizens Bank statement in the name "Jose Navarro" (Brito-Melo). [Ex. 1, p. 13]

After the stop and search, Rivera and Brito-Melo were detained for an hour on the side of the road. At approximately 10:30 PM, three Agents returned to the Quarry Street Apartment to conduct a search of the blue Saab with a K-9 certified in the detection of narcotic odors. [Ex. 2, p. 19; Ex. 3, ¶ 6] The K-9 allegedly alerted positively to the rear hatch area of the blue Saab. [Ex. 2, p. 19; Ex. 3, ¶ 6] At approximately 10:45 PM, Rivera and Brito-Melo were transported in the back of a police cruiser, from the site of the stop to the Quarry Street Apartment. [Ex. 2, p. 19; Ex. 3, ¶ 7] Rivera and Brito-Melo were interrogated by a Spanish-speaking Agent upon their return to the Quarry Street Apartment while in the back of a cruiser. [Ex. 2, p. 20; Ex. 3, ¶ 7]

Rivera's keys were confiscated from the white Taurus; one key was for the blue Saab and two were for the Quarry Street Apartment. [Ex. 2, p. 20; Ex. 3, ¶ 7] After

---

[6] Exhibit 4 is Trooper Charles F. Kane's Arrest Report.
[7] Brito-Melo arrived at the Quarry Street Apartment at 9:42PM and the stop occurred at 9:47PM.
[8] There was no visible marking of lanes in that particular area.

4

being in custody for over an hour, Rivera allegedly consented to the search of the blue Saab. Approximately one ounce of cocaine wrapped in tinfoil was found in a hidden compartment within the trunk of the Saab. [Ex. 2, p. 21; Ex. 3, ¶ 8] Rivera was then placed under arrest. [Ex. 2, p. 21; Ex. 3, ¶ 9] According to Agent O'Neil, Brito-Melo was placed under arrest due to an outstanding INS detainer for illegal entry into the United States. [Ex. 3, ¶ 9; Ex. 2, p. 21] Most likely, Agents were aware of this detainer for months. Trooper Kane said Brito-Melo was arrested for having a false driver's license. [Ex. 4]

While Brito-Melo and Rivera were being transported to the State Police barracks in South Boston, Agents used Rivera's keys to gain entry and conduct what they characterized as a "protective sweep" of the Quarry Street Apartment. [Ex. 2, p. 21; Ex. 3, ¶ 10]

**THE SEARCH WARRANTS**

On July 8, 2005, Agent O'Neil applied for a search warrant for the Quarry Street Apartment and the Garage. [Ex. 1] Based on the Affidavit submitted by Agent O'Neil, Chief Magistrate Judge Swartwood issued search warrants for the Quarry Street Apartment and door number 9 of the Garage, as well as a white Volvo station wagon inside the Garage. [Ex. 1, p. 3]

The warrants were executed on July 8, 2005, and Agents seized seven kilograms of cocaine from a closet located in the hallway of the apartment. Also seized was a checkbook from Citizen's Bank in the name "Jose Navarro" from the same hallway closet. No drugs or contraband were found in the Garage or white Volvo. Based on the

5

foregoing, on July 12, 2005, Agent O'Neil requested, and was granted, a search warrant for Brito-Melo's residence in Weymouth. [Ex. 2]

Pursuant to the warrant, Agents seized miscellaneous documents from Brito-Melo's residence, including two notebooks allegedly containing notations of drug transactions. [Ex. 5][9]

## ARGUMENT

I.  **The Citizens Bank Statement in the Name "Jose Navarro" Seized From the white Ford Taurus Should be Suppressed Because the Traffic Stop and Subsequent Search of the Vehicle was Unlawful.**

   A.  **Brito-Melo's Standing to Contest the Search of the White Taurus**

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "As interpreted, the Fourth Amendment's prohibition against unreasonable searches and seizures extends only to protect those places and interests in which the accused can be characterized as having a legitimate expectation of privacy." *United States v. Sugar*, 322 F. Supp. 2d 85, 90 (D.Mass. 2004), quoting *United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir. 1990).

Before asserting a violation of his Fourth Amendment rights, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable, i.e., one which has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143-44 and n. 12 (1978). One who is merely present during a search may not,

---

[9] Exhibit 5 is the Search Warrant Return for the warrant executed at 6123 Avalon Drive in Weymouth, Massachusetts.

without more, claim the protections of the Fourth Amendment. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

In *Minnesota v. Olson*, the Court held that an overnight guest in a house had the sort of expectation of privacy that the Fourth Amendment protects. 495 U.S. 91, 96-97 (1990). Similar to the defendant in *Olson*, Brito-Melo was not just a passenger in Rivera's vehicle. Based on Agents' observations, Brito-Melo was the last person in possession and control of the vehicle. [Ex. 3, ¶ 4] His bank statement was found (and seized) in the vehicle. [Ex. 3] Since, "[g]enerally speaking, persons who borrow cars have standing to challenge searches of the borrowed vehicles[,]"[10] and Brito-Melo was more than merely present in the car with Rivera on July 7, 2005, the Taurus was a place where he personally had a reasonable expectation of privacy.

> **B.    Brito-Melo's Fourth Amendment Challenge to the Search**

"In determining whether, in the absence of probable cause, an investigatory seizure and search violates the Fourth Amendment, [the First Circuit] use[s] the two-prong test set forth in *Terry v. Ohio*." *Sugar*, 322 F.Supp. 2d at 91. The court must first consider "whether the officer's actions were justified at their inception..." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). A stop is justified at its inception when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1961). *See United States v. Young*, 105 F.3d 1, 7 (1st Cir. 1997). Second, if the stop is justified under *Terry*, the court must then inquire as to "whether the officer's subsequent actions were fairly responsive to the emerging tableau." *Chhien*, 266 F.3d at 10. Under this principle of proportionality, police may engage in activities that are

---

[10] *Sugar*, 322 F.Supp. 2d at 94.

7

reasonably related in scope to the circumstances that justified the initial stop. *See Terry*, 392 U.S. at 20.

### 1.     The Stop Was Unjustified from its Inception

Trooper Kane stated that he stopped the Taurus at the request of Agent O'Neil. [Ex. 4] Although he did not issue a citation, he said that he stopped the Taurus because the vehicle "failed to stay within the right travel lane, drifting into the breakdown lane twice." [Ex. 4]

M.G.L. c. 89, § 4A states, in pertinent part, that

> [w]hen any way has been divided into lanes, the driver of a vehicle shall so drive that the vehicle shall be entirely within a single lane and, he shall not move from the lane in which he is driving until he has first ascertained if such movement can be made with safety…

The First Circuit has held that police may rely upon a minor traffic violation for an arrest actually prompted by other law-enforcement aims as long as there is an actual violation. *Bolton v. Taylor*, 367 F.3d 5, 14 (1st Cir. 2004). *See Whren v. United States*, 517 U.S. 806, 806 (1996) (officers may lawfully stop a car if they have probable cause to believe that a criminal violation, including a traffic violation, has occurred).

However, many courts, including the First Circuit, have also held that a single, momentary crossing over the fog line, does not, standing alone, justify the intrusiveness of a traffic stop. *See*, *e.g.*, *Sugar*, 322 F.Supp. 2d at 92 (holding Missouri statute was not violated when RV crossed "fog line" on the shoulder once, making the stop illegal); *United States v. Colin*, 314 F.3d 439, 446 (9th Cir. 2002) (officer had insufficient evidence to justify the stop where no demonstration of pronounced weaving and officer only observed vehicle for 35 to 40 seconds); *United States v. Gregory*, 79 F.3d 973, 978

8

(10th Cir. 1996) (holding that a U-Haul truck's one time entry into the emergency lane on a windy road failed to justify stop).

Here, the facts warrant one conclusion. Trooper Kane was directed to stop the Taurus. [Ex. 4] He did so within five minutes. An objective analysis of this stop must conclude that that it was clearly pretextual and, therefore, unlawful. Trooper Kane made no observation which could be characterized as unsafe driving, even though § 4A proscribes only moving from the lane in which a driver is driving "until he has first ascertained if such movement can be made with safety…" Because the stop of the car was unlawful, the bank statement and other documents seized should be suppressed.

## II.     Brito-Melo's Continued Detention was Unlawful, and any Evidence Seized as a Result Must be Suppressed.

Although the Supreme Court has reiterated its unwillingness to draw a "bright line" in respect to the duration of a *Terry* stop, "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Brito-Melo's hour-long detention, without the discovery of any contraband, converted an already unlawful stop into an even more intrusive *de facto* arrest based on less than probable cause.[11]

When Trooper Kane's search of the vehicle proved to be fruitless, a common theme in the seven month investigation of Brito-Melo and Rivera,[12] he waited for other

---

[11] "There is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause – detentions that are sometimes called "de facto arrests." *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994). *See Florida v. Royer*, 460 U.S. 491, 506 (1983) (opinion of White, J.); *United States v. Quinn*, 815 F.2d 153, 156 (1st Cir. 1987). "The conventional method of classification in respect to such detentions consists of asking whether 'a reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." *Zapata*, 18 F.3d at 971, quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

[12] On May 18, 2005, surveillance revealed Rivera entered a black Infiniti, driven by another male, with a paper bag. Trooper Fallon of the K-9 Unit stopped the Infiniti and conducted a "consent search" of the

9

officers to arrive and the defendants were kept in custody on the side of the road for an hour. [Ex. 2, p. 19] Meanwhile, Trooper Kane and a K-9 conducted a search of the blue Saab Rivera was seen driving earlier that day. [Ex. 3, ¶ 6] After the K-9 supposedly alerted the rear of the Saab, Rivera and Brito-Melo were returned to the Quarry Street Apartment. [Ex. 3, ¶ 7] Upon their return, and after Rivera allegedly gave consent to the search of the blue Saab, tinfoil containing cocaine was found in a hidden compartment in the trunk of the vehicle. Finally, Rivera was placed under arrest (officially) for drug related charges and Brito-Melo was arrested (officially) for illegal entry into the United States (according to Agent O'Neil), or for possessing a false driver's license (according to Trooper Kane). [Ex. 3, ¶ 7; Ex. 4]

It is clear the Agents involved in this investigation had run out of options by the time of the stop of the white Taurus on July 7th. Their seven-month investigation, with surveillance, previous warrantless stops and searches,[13] and wiretaps, had proven futile. After the stop of the Taurus proved to be fruitless, Agents made a final attempt to salvage their investigation, without probable cause of any kind, by extending the scope and location of the search to the blue Saab back at 290 Quarry Street. The actions of the police in the 90 minutes that transpired from the time Trooper Kane stopped Rivera and Brito-Melo until the time the two were placed under arrest, transformed the original *Terry* stop into a *de facto* arrest. *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). Thus, any evidence obtained after the defendants' unlawful seizure should be suppressed. *Wong Sun v. United States*, 371 U.S. at 471, 487-88 (1963).

---

vehicle. During this consent search, the K-9 made a positive alert to a brown paper bag, which actually contained clothes, a cell phone, a calculator and some papers, not contraband. During the same search, the K-9 alerted positively to a hidden compartment that was also found to be empty. [Ex. 1, p. 9-10]
[13] See Ex. 1, p. 9-10.

**III.    The Cocaine Discovered in the Blue Saab Should be Suppressed as the Product of an Unconstitutional Seizure, because The Dog Sniff of the Blue Saab was Conducted while Brito-Melo and Rivera were Being Unlawfully Detained Pursuant to a Prolonged Traffic Stop.**

**A.    The Dog Sniff Impermissibly Extended the Scope of the Initial Seizure of Brito-Melo and Rivera**

The opinion in *Illinois v. Caballes*, 543 U.S. 405 (2005), is the most recent pronouncement on traffic stops that become transformed by dog sniffs. There, during a traffic stop that lasted no longer than ten minutes, the defendant was stopped by one trooper for speeding. *Id.* at 406. A second trooper arrived *at the scene* with a K-9 dog. *Id.* While the first trooper was issuing the driver a warning, the second trooper walked the dog around the car, at which point the dog alerted to the trunk of the car. *Id.* The troopers found marijuana and arrested the driver. *Id.* The Court held that this particular dog sniff, performed during a lawful traffic stop, did not violate the Fourth Amendment. *Id.* at 410.

However, the Court in *Caballes* noted that a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407-08. The Court noted that if the traffic stop had been unreasonably prolonged by the dog sniff, it would have been unlawful. *Id.* at 408. Moreover, Justice Souter indicated in his dissent, that he did not interpret the Court's decision to be a "recognition of a broad authority to conduct suspicionless sniffs for drugs in any parked car…" *Id.* at 417.

Thus, this Court's inquiry should be whether the canine sniff of the Saab impermissibly extended the scope of the initial seizure of Brito-Melo and Rivera. Although the Court in *Caballes* held that the stop was not unlawfully prolonged by the dog sniff, the facts are distinguishable from those in the present case. Here, the dog sniff

11

did not occur at the scene of the initial stop and did not even involve the same vehicle. The dog sniff occurred at the Quarry Street Apartment after Brito-Melo and Rivera had already been detained approximately 60 minutes after a fruitless search of the Taurus. The search involved a *parked* blue Saab that the Agents last saw Rivera operate at 9:30 PM.  A suspicionless sniff search of the Saab under these circumstances is unlawful.  *See United States v. Quinn*, 815 F.2d 153, 159 (1st Cir. 1987) (officers must have reasonable suspicion that a car contains narcotics at the moment a dog sniff is performed); *United States v. Place*, 462 U.S. 696, 706-07 (1983) (Fourth Amendment not violated by a dog sniff of a piece of luggage that was seized, pre-sniff, where it was based on *reasonable suspicion* of drugs) (Emphasis added).

Thus, even if the drug sniff is not characterized as a Fourth Amendment "search," *cf. Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Place*, 462 U.S. at 707, the instant sniff of the blue Saab significantly broadened the scope of the initial stop and rendered it an illegal search, requiring suppression of all evidence obtained thereby.

    **B.**    **The Manner in Which Law Enforcement Officers Effected the Seizure and Subsequent Search of the Blue Saab Rendered the Seizure Unreasonable Absent Probable Cause.**

There is no doubt that Agents made a "seizure" of the blue Saab for purposes of the Fourth Amendment when Agent O'Neil and other Agents met at the vehicle, outside the presence of Brito-Melo and Rivera, with the sole purpose of exposing the vehicle to a dog sniff.  As articulated in *Terry*, "[the] manner in which the seizure … [was] conducted is, of course, as vital a part of the inquiry as whether [it was] warranted at all."  *Terry*, 392 U.S. at 28.

12

Independent of the unlawful traffic stop, the facts surrounding the unlawful search of the blue Saab in this case are analogous to those in *United States v. Place*, 462 U.S. 696 (1983). In *Place*, law enforcement authorities detained personal luggage, on the basis of reasonable suspicion[14] that the luggage contained narcotics, at New York's La Guardia Airport and transported the luggage to New York's Kennedy Airport, so that a narcotics dog could perform a "sniff test" of the bags. *Id.* at 698. Place did not consent to the search of his luggage and did not accompany the agents to Kennedy Airport. *Id.* at 699. Approximately 90 minutes later, the dog reacted positively to one of the two bags seized from Place. *Id.*

There, the Court noted that the length of the detention of the luggage alone precluded a finding that the seizure was reasonable in the absence of probable cause because, in assessing the effect of the length of the detention, the Court must take into account whether the police acted diligently in pursuit of their investigation. *Id.* at 709. The Court reasoned that the New York agents knew the time of Place's scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion of Place's interests. *Id.*

Similar to the circumstances in *Place*, Agents here were conducting surveillance of the Quarry Street Apartment and the Garage for two months. In fact, they had conducted surveillance of Rivera on the morning of July 7, 2005, and knew he had left the Quarry Street Apartment early in the morning and returned to the Quarry Street Apartment later that night. Thus, if they had probable cause to believe contraband was in the blue Saab, they could have applied for a search warrant. The agents clearly did not

---

[14] Unlike the seizure in *Place*, Agents could not make a case for "reasonable suspicion" that the blue Saab contained narcotics, especially since the bags that they suspected as being used to carry narcotics or other contraband were not in the vehicle at the time of the canine sniff.

13

feel justified in either performing a canine sniff or submitting an application for a search warrant prior to the stop of the Taurus. Moreover, nothing that transpired during the stop and subsequent search of the Taurus enhanced their position by supplying reasonable suspicion or probable cause. Finally, Rivera and Brito-Melo were in custody and agents had the keys to the Saab. Nothing prevented them from seeking a warrant to search the car at that time. They did not seek a warrant, of recognition of their lack of probable cause.

Instead, what happened in this case is that Agents were investigating Brito-Melo and Rivera for seven months preceding their arrest and their efforts proved to be fruitless. They conducted several "consent" vehicle searches during this time and installed a GPS device in a vehicle believed to belong to Brito-Melo, neither of which led them to any criminal activity. [Ex. 1, p. 7, 9-10] They applied for, and were granted, two Interception Orders, the last of which expired on May 19, 2005. [Ex. 6, ¶ 1] They also installed a pole camera at an apartment in the same building as the Quarry Street Apartment that did not reveal any criminal activity. [Ex. 1, p. 7] When they finally saw Brito-Melo returning the Taurus to Rivera at the Quarry Street Apartment, they took this opportunity to effectuate a pretextual stop of the vehicle, hoping to get lucky. When this search proved fruitless, they *then* decided to detain Brito-Melo and Rivera and return to the Quarry Street Apartment to conduct a dog sniff search of the blue Saab, in a determined, but unlawful, attempt to discover contraband.

Following the reasoning in *Place*, Rivera's and Brito-Melo's detention and the subsequent search of the blue Saab went beyond the narrow authority possessed by police

14

to investigate their suspicions. *See Terry*, *supra*. The evidence obtained from the search of the Saab should be suppressed.

IV. **The Evidence Seized from the Quarry Street Apartment and Brito-Melo's Residence Should be Suppressed Because the Warrants were Tainted by Information Obtained as a Result of Illegal Searches, and Unreasonable Interpretations of Wiretap Conversations.**

After Agents obtained a search warrant for the Quarry Street Apartment based, in part, on the evidence they seized pursuant to the illegal searches on July 7, 2005,[15] they found seven kilograms of cocaine and a Citizens Bank checkbook in the name "Jose Navarro" located in the same hallway closet. As a result of their warrantless searches, their search at the Quarry Street Apartment, and certain erroneous wiretap interpretations, they obtained a search warrant for Brito-Melo's personal residence where they found alleged drug records. [Ex. 2]

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States v. Leon*, 468 U.S. 897, 914 (1984), citing *United States v. Chadwick*, 433 U.S. 1, 9 (1977), courts have expressed a strong preference for warrants. *Leon*, *supra*. *United States v. Ventresca*, 380 U.S. 102, 106 (1965).

However, deference to the magistrate is not boundless. *Leon*, 468 U.S. at 914. The deference accorded to a magistrate's finding of probable cause for the issuance of a warrant does not preclude inquiry into the quality of the information found in the affidavit upon which that determination was based. *Id.*; *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Suppression, therefore, remains an appropriate remedy if the

---

[15] [Ex. 1]

magistrate was misled by information in an affidavit that was illegally obtained or that the affiant should have known was erroneous except for his reckless disregard for the truth. *Wong Sun*, 371 U.S. at 487-88; *Franks*, 438 U.S. at 154; *Murray v. United States*, 487 U.S. 533, 542 (1988).

      **A.**      **Search Warrant for Apartment #705 Located at 290 Quarry Street in Quincy, Massachusetts**

The Affidavit submitted by Agent O'Neil in his application for the Quarry Street Apartment consisted of little more than erroneous interpretations of harmless conversations and information gathered from the illegal searches that took place on July 7, 2005.

In paragraph 16, Agent O'Neil described Rivera's "suspicious behavior" which consisted of leaving the Quarry Street Apartment with a "large black suit case on wheels." [Ex. 1, p. 8] In paragraph 17, O'Neil noted that on May 17, 2005, Rivera entered the Quarry Street Apartment with two bags, one white and one black, which "appeared to be heavy." [Ex. 1, p. 8] That same night, an unidentified male arrived at the Quarry Street Apartment carrying a "brown paper bag with handles." [Ex. 1, p. 8-9]

On May 18, 2005, Agents observed Rivera and the unidentified male entering the black Infiniti the man had driven to the Quarry Street Apartment the night before. This time Rivera was carrying "what appeared to be the same brown paper bag that [the male] had brought in the night before." As a result of this "suspicious activity," a State Police Trooper of the K-9 Unit stopped the black Infiniti for a "motor vehicle violation." [Ex. 1, p. 9] The K-9 made positive alerts to the brown paper bag, which was later found to contain nothing more than clothes, a cell phone, a calculator, and some papers. [Ex. 1, p. 9-10]

On June 22, 2005, Agents again observed "suspicious activity" while they were following Rivera. This time it consisted of Rivera carrying a "heavy black plastic bag" and talking on his cell phone numerous times while he was driving. [Ex. 1, p. 10] On July 1, 2005, Rivera was seen with "a large black suitcase." [Ex. 1, p. 11]

Agent O'Neil's observations until the day of Brito-Melo's and Rivera's arrests were speculative, and taken alone, did not furnish probable cause to search. Indeed, no effort to obtain a search warrant was made until after the illegal searches of July 7, 2005. For this reason, the search was unlawful. Therefore, any evidence recovered from the Quarry Street Apartment should be suppressed.[16]

### B.    The Search Warrant for Brito-Melo's Residence, an Apartment Located at 6123 Avalon Drive in Weymouth, Massachusetts

Again, the Agents' interpretation of the intercepted phone calls provided in the Affidavit is unwarranted. For example, in paragraph 12, Agent O'Neil claimed that when Brito-Melo told an unidentified party that they have to get together to "do that" or to buy "that thing," this conversation regarded the sale of drugs. Additionally, in paragraph 13, Agent O'Neil represented that as a result of a phone conversation on April 16, 2005, he determined there was a "stash house". This conversation was not discussed in detail as all other conversations in the Affidavit were, and after review of the actual conversations, the only reference made to a location of any kind, was again "around there." [Ex. 7][17]

---

[16] On April 16, 2005, Agents observed Brito-Melo in the area of Furnace Brook Parkway Rotary in Quincy. [Ex. 1, p. 6] Agents followed Brito-Melo to the rear parking lot of 290 Quarry Street, where they then observed Rivera walk across the parking lot. [Ex. 1, p. 6] On April 26, 2005, Agents observed Brito-Melo park in the rear parking lot of the Quarry Street Apartment. [Ex. 1, p. 7] Thus, Agents believed Brito-Melo frequented what they describes as his "stash house." [Ex. 2, p. 6]

[17] Exhibit 7 is the synopsis of a telephone conversation intercepted by Agents on April 16, 2005.

This conversation was alleged to have taken place approximately one week before the expiration of the initial Interception Order.[18]

In paragraphs 14 to 18, O'Neil also referenced conversations interpreted as Brito-Melo's discussion of the sale of drugs. [Ex. 2, p. 7-9]  For instance, on April 23, 2005, Brito-Melo asked Rivera to pick up some "tickets" for him. [Ex. 2, p. 7]  Agent O'Neil opined that "tickets" meant money.  Again, in Paragraph 15, a discussion about cars is called a code for cocaine.  However, Brito-Melo discussed rental cars and Brito-Melo's attempt to buy a car on several occasions. [Ex. 9][19]  Moreover, Agents noted that Brito-Melo rented a vehicle in their surveillance logs. [Ex. 10, ¶ 2][20]  This information was not included in the Affidavit.  Therefore, it was unreasonable for O'Neil to state that every time Brito-Melo mentioned a car, he really meant cocaine.

Not only is the affidavit that supports the search warrant for Brito-Melo's residence tainted by unsupported conclusions, it is also tainted by the evidence Agents and law enforcement officers seized as a result of the illegal searches discussed above. *Wong Sun*, *supra*, at 484-85.  When these statements are severed from the Affidavit, along with the fruits of the unlawful searches, what remains is insufficient to establish probable cause to search the residence.  Therefore, any evidence recovered from Brito-Melo's apartment should be suppressed.

---

[18] The Authorization for Interception Order was granted on March 25, 2005 and authorized a thirty day period for the interception of wire communications from Brito-Melo's cellular telephone.  On April 22, 2005, the Order was extended for an additional thirty days.  Notably, it was not extended beyond the May 19, 2005 expiration, i.e. agents intercepted no telephone conversations between Rivera and Brito-Melo for 50 days prior to the arrest that helped them establish probable cause of criminal activity.  During that time, Brito-Melo was seen at the Quarry Street Apartment only on the day of his arrest.

[19] Exhibit 9 is a collection of six conversations Brito-Melo participated in from March 25, 2005 to April 1, 2005.

[20] Exhibit 10 is a Drug Enforcement Administration Form-6 Prepared by Agent Daniel McGinn on April 25, 2005.

**CONCLUSION**

For the reasons stated above, the Court should suppress all evidence obtained from the white Taurus, the blue Saab, from 290 Quarry Street in Quincy, Massachusetts, and from 6123 Avalon Drive, Weymouth, Massachusetts.

**REQUEST FOR ORAL ARGUMENT**

        Respectfully Submitted,
        WILGEN ANIBAL BRITO-MELO
        By his attorneys,

        /s/  John H. Brazilian
        John H. Brazilian
        B.B.O. No. 054980
        Andrea J. Gonzalez
        B.B.O. No. 663753
        Butters Brazilian LLP
        One Exeter Plaza
        Boston, Massachusetts 02116
        (617) 367-2600

Dated: February 24, 2006

**CERTIFICATE OF SERVICE**

I, John H. Brazilian, hereby certify that on this date, the above document was served, by first-class mail, upon the following: J. Thomas Kerner, Esq., at 230 Commercial Street, 1st Floor, Boston, MA  02109, and Peter K. Leavitt, Assistant United States Attorney, United States Attorney's Office, Suite 9200, 1 Courthouse Way, Boston, MA  02210.

        /s/ John H. Brazilian
        John H. Brazilian

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff<br>　v.<br><br>WILGEN ANIBAL BRITO-MELO,<br>and ANGEL RIVERA,<br>　　　　　Defendants | )<br>)<br>)<br>)　**CRIMINAL ACTION**<br>)　**NO.  05-1684-PBS**<br>)<br>)<br>)<br>) |

### NOTICE OF FILING WITH THE CLERK'S OFFICE

Notice is hereby given that the exhibits to the attached *Memorandum of Law in Support of Defendant Wilgen Anibal Brito-Melo's Motion to Suppress Evidence* have been manually filed with the Court and are available in paper form only.  The original documents are maintained in the case file in the Clerk's Office.

           WILGEN ANIBAL BRITO-MELO
           By his Attorneys,


            /s/ John H. Brazilian
           John H. Brazilian
           B.B.O. No. 054980
           Andrea J. Gonzalez
           B.B.O. No. 663753
           BUTTERS BRAZILIAN LLP
           One Exeter Plaza
           Boston, Massachusetts 02116
Dated: February 24, 2006           (617) 367-2600