IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 05-10227-PBS |
| | : | |
| WILGEN ANIBAL BRITO-MELO et al. | : | |
| | : | |

## UNITED STATES' OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The United States respectfully submits that defendant's motion to suppress evidence

should be denied.  First, defendant WILGEN BRITO-MELO ("BRITO") does not have standing

to seek suppression of any evidence seized from the blue Saab and the apartment in Quincy

where the DEA seized cocaine, drugs proceeds, and a firearm.  Second, the stop of the white

Taurus in which RAFAEL HUERTA ("HUERTA") was the driver and BRITO was the

passenger was lawful because: (a) there was probable cause to believe that a traffic infraction

took place; (b) there was probable cause to arrest BRITO based on a deportation warrant and his

use of a fraudulent identity; and (c) there was at least reasonable suspicion that BRITO and

HUERTA were involved in the distribution of narcotics at the apartment in Quincy.  The search

warrants subsequently issued by Magistrate Judge Swartwood for apartments in Quincy and

Weymouth had a substantial basis.  The motion should be denied.

## I.  FACTUAL BACKGROUND

**A.**    **Information from DEA Confidential Source ("CS")**

The investigation that led to the indictment in this case began in approximately January

2005.  The investigation was initiated based on information from a DEA confidential source (hereinafter the "CS")[1] in New York City.  In December 2004, the CS told investigators that a Dominican male known to the CS only as "Wilgen" was in charge of distributing narcotics for a large-scale cocaine trafficking organization based in the Dominican Republic.  The CS said that "Wilgen" came to United States from the Dominican Republic in 1994, began to work in the narcotics business with his cousin in New York City, and thereafter in 1996 went to Boston and continued to work in the narcotics business.

Agents in New York later showed the CS an immigration photograph of WILGEN ANIBAL BRITO.  The CS positively identified BRITO as the drug trafficker the CS knew as "Wilgen."  According to immigration records, BRITO illegally entered the United States, was ordered deported, but failed to report for deportation proceedings.  On July 25, 1996, the INS issued an administrative warrant for deportation.

**B.      November 2004 Seizure of Sixty Kilograms of Cocaine in New York City.**

In November, 2004, investigators in New York intercepted sixty (60) kilograms of cocaine sent from the Dominican Republic. An attempt to conduct a controlled delivery of this cocaine to its intended recipient, a Dominican male then known only as "Buchito," failed when "Buchito" grew suspicious of the undercover agents.  Undercover agents had many discussions with "Buchito"; the same two telephones he used were in constant contact with a telephone number used by BRITO, Nextel telephone number (617) 590-5820 (hereinafter the "target telephone").

**C.      DEA Wiretap Investigation in Boston.**

---

[1]This CS was referred to as CS2 in TFA Kevin O'Neil's March 25, 2005 affidavit submitted in support of a Title III wiretap on a cellular phone used by BRITO.

On March 25, 2005, U.S. District Court Judge William G. Young signed an order authorizing the DEA in Boston to intercept telephone conversations over the target telephone. This wiretap continued until May 16, 2005, when BRITO stopped using the target telephone. During the course of the wiretap, BRITO spoke regularly with another Dominican male whom he called "Pinto." "Pinto" appeared to be working with BRITO in the drug business. "Pinto" was later identified as defendant RAFAEL HUERTA, a.k.a. Angel F. Resto-Rivera, a.k.a. Hector Colon ("Huerta" or "Pinto").[2]  BRITO instructed Pinto to collect drug proceeds.[3]  During these intercepted calls,[4] Pinto utilized a cellular phone subscribed to Gerald Rodriguez, 42 Whitfield, Apt. 20, Dorchester, MA.

For example, during an intercepted call on March 31, 2005,  Pinto told BRITO that he was running an errand, picking up some "tickets" (common code/slang for drug proceeds). During the next call, which was a continuation of the previous conversation, BRITO asked Pinto if "the guy" had given him anything yet.  Pinto said that he would mention it to him, so they can talk.  Pinto then said that he had "12 pesos" ($12,000).  Moments later, Pinto again repeated that "he" gave him (Pinto) "12 pesos" and that he (Pinto) had it with him.  At the end of the call, Pinto told BRITO that he was heading north because he had to go to "*Paisa*" (slang for a person from the countryside) to pick up some "tickets."

During an intercepted call on April 12, 2005, Pinto told BRITO that "Paisa" asked him

---

[2]HUERTA was charged in the criminal complaint as Angel Resto-Rivera.  However, before the probable cause hearing in this matter, defendant indicated through his counsel that his true name was RAFAEL HUERTA. During the contested traffic stop conducted on July 7, 2005, defendant HUERTA identified himself as Hector Colon.

[3] The intercepted calls were in Spanish and were translated by government contract interpreters.

[4]Most of the communications between BRITO and HUERTA, a.k.a. "Pinto" where in not in fact regular telephone calls, but Nextel radio, direct-connect or "point-to-point" communications, which were referred to the line-sheets as "PTT."  However, for the sake of simplicity, they are referred to herein as "calls."

(Pinto) to ask "Julian" for "work" (common code/slang for drugs). Pinto asked BRITO what he should tell "Paisa." BRITO asked Pinto to find out what it is. BRITO said that the "number" (the price) is "one-and-a-half" and that he ("Paisa") had to get BRITO "500 pesos."

On April 23, 2005, BRITO called Pinto and asked Pinto to run an "errand" and told him that a guy had called him (BRITO) to pick up some "tickets" (money) from East Boston. BRITO said the "thin guy" had been calling all day for BRITO to pick up "that money."

**D.    Physical Surveillance**

During the course of the wiretap investigation, law enforcement agents conducted surveillance of several apartment buildings with which BRITO and HUERTA were connected. Through pen register data and surveillance, BRITO's home was identified as the Avalon Ledges Apartments in Weymouth. This was confirmed by intercepted calls, including one on March 29, 2005, in which a woman named Rita from the leasing office at Avalon Ledges called BRITO. Rita referred to BRITO as "Jose."

"Jose" appeared to be part of an alias that BRITO was using. The registration for a Dodge Durango that BRITO was driving came back to a Thrifty Rental car rented by "Jose Navarro" of 167 Kennedy Drive in Malden, MA. The contact telephone number listed on the Thrifty rental agreement was (617) 590-5820, the target telephone. BRITO had rented the Dodge Durango between March 19, 2005 and April 14, 2005 while BRITO was having a green 1999 Oldsmobile Intrigue repaired.

Agents determined that BRITO spent significant periods of time in New York. Significantly, according to CS described above, BRITO often traveled to New York to conduct drug business. In intercepted calls, BRITO said that he had to go to New York. Agents later

installed a GPS tracking device on one of the cars BRITO used.  Agents were then able to

determine when BRITO traveled to New York.

The driver's license photograph for Jose Navarro depicted BRITO, according to DEA

Task Force Agent ("TFA") Kevin O'Neil (who is also a Trooper with the Massachusetts State

Police ("MSP")).  TFA O'Neil compared this RMV photograph of Navarro with BRITO's

immigration photo and confirmed that they were the same person.[5]

Early in the investigation, agents determined that HUERTA was residing at 42 Whitfield

Street, Apt. 20, in Dorchester, MA, the address on the contract for the "Gerald Rodriguez"

cellular telephone used by HUERTA.  Surveillance agents reported that this was the same

address to which HUERTA typically returned at night, and where the two cars that he often

drove during the period of the investigation, a white Ford Taurus, bearing MA registration

50JJ17 (the "white Taurus") and a blue Saab, bearing MA registration 58XP05 (both registered

to Deborah Miranda) (the "blue Saab"), spent many nights.

**E.      Identification of 290 Quarry Street, Apt. 705 and Garage #9, Quincy, MA as a Stash
          Location**.

Investigators first identified 290 Quarry Street, Apartment #705, Quincy, MA as a

possible stash location for BRITO and HUERTA, a.k.a. Pinto on April 16, 2005.  During an

intercepted call on April 16, 2005, at approximately 8:25 p.m.,Pinto asked BRITO how far away

he was.  BRITO said he would be "there" in a couple of minutes.  At this time, agents believed

that BRITO and Pinto would be meeting somewhere in the area of Copeland Street off the

---

[5]Furthermore, during an intercepted call on March 25, 2005, BRITO received a voice mail from a Thrifty Rental Car employee who left a message for Jose Navarro.

Furnace Brook Rotary in Quincy.[6]

After this call, TFA Kevin O'Neil set up surveillance in the area of the Furnace Brook Rotary and Copeland Street in Quincy.  At around 8:37 p.m., TFA O'Neil saw BRITO driving a green Oldsmobile Intrigue,[7] bearing MA registration 63TT49, registered to Jose Navarro, on Furnace Brook Parkway near Copeland Street.  TFA O'Neil followed BRITO a short distance to a large red brick apartment complex at 290 Quarry Street, Quincy, known as "the Avalon Summit West."  Around the same time, in several intercepted calls, BRITO told Pinto that he had just arrived at "Pinto's" location.  At around 8:50 p.m., TFA O'Neil saw a heavy-set Hispanic male with a mustache, later identified as RAFAEL HUERTA, a.k.a. Angel Resto-Rivera, a.k.a. Pinto walk across the parking lot at the Avalon Summit West apartment building at 290 Quarry Street.

During a series of calls on April 23, 2005, BRITO arranged for Pinto to pick up an undetermined amount of drug proceeds from "Felipe" at a Mobil gas station in the area of the Furnace Brook Rotary in Quincy, a short distance from 290 Quarry Street.  "Felipe" told BRITO he would be driving "Victor's SUV."  BRITO told "Felipe" that he would be meeting a light-skinned fat guy that "Felipe" knew as "Pinto."  At 6:04 p.m., BRITO told Pinto to go to the gas station now and to put "it" away for him.  Based on the context of the conversations (as well as earlier conversations during the wiretap), agents believed that BRITO was talking about money and BRITO was instructing Pinto to put it away in a safe place.

---

[6]This belief was based in part on prior intercepted calls, in which  BRITO and Pinto talked about meeting each other in a particular location,when BRITO's cellular phone had been utilizing a cellular phone tower in the area of Copeland Street near the Furnace Brook Rotary. Agents obtained this cell-site information contemporaneous with intercepted phone calls pursuant to 18 U.S.C. Sec. 2703(d) as part of the wiretap order.

[7]On May 3, 2005, agents installed a Global Positioning System (GPS) device on this vehicle pursuant to a court order signed on May 2, 2005 by U.S. Magistrate Judge Marianne B. Bowler.

At 6:08 p.m., "Felipe" asked BRITO what Pinto would be driving.  BRITO answered that Pinto would be driving a white Ford Taurus.  At 6:13 p.m., BRITO again described Pinto to "Felipe" as a light-skinned fat guy who would be driving a white Ford Taurus.  BRITO asked "Felipe" if he was scared or worried that Pinto was the police.  "Felipe" responded no and said he did not want to give "it" (the money) to anyone else (other than Pinto).

After these calls, at around 6:20 p.m., TFA O'Neil saw the white Ford Taurus pull into a Mobil gas station on Furnace Brook Parkway at Copeland Street in Quincy.  Shortly thereafter, TFA O'Neil saw a white Toyota Rav4, bearing MA registration 38VT05[8], pull into the gas station and park next to the white Taurus.  TFA O'Neil saw Pinto approach the Toyota Rav4, open the passenger door, and remove a red and white paper shopping bag from the Rav4.  TFA O'Neil then saw Pinto put the white shopping bag, which appeared to be weighted (and which agents believed to contain drug proceeds), into the white Taurus and drive off.  TFA O'Neil followed Pinto back to 290 Quarry Street and saw Pinto enter the rear door of 290 Quarry Street with the same white paper bag.

Agents got a copy of the lease and confirmed that Apartment 705 was being rented by a Angel Resto-Rivera, beginning September 6, 2004 and ending September 6, 2005.  The lease application included a photocopy of a Massachusetts license for "Angel Resto-Rivera" of 42 Whitfield Street, Apt. 20, Dorchester, MA, bearing a photograph of Pinto.  Pinto also rented a garage on the premises, Garage #9, and paid a total of $1,135 per month for the rental of both the apartment and the garage.

During an intercepted call on April 27, 2005, at approximately 5:07 p.m., BRITO asked

---

[8]The Rav4, believed to be "Victor's SUV," was registered to Victor Delgado-Caballero.

Pinto where he was and asked Pinto if he was going to be around "there" today.  Pinto said yes.

BRITO said that he needed "that" (but did not specify what "that" was).  Following this call,

MSP Sgt. Thomas Quinn, who was conducting surveillance in the area of 290 Quarry Street, saw

a white Volvo station wagon arrive in the area and park in Garage #9, Pinto's garage. Sgt.

Quinn[9] then saw an Hispanic male, whom he could not identify, exit the garage and enter the rear

door of 290 Quarry Street.  At around 10:15 p.m., Sgt. Quinn saw two Hispanic males exit the

rear door of 290 Quarry Street.  One of the males got into a black Infiniti with MA registration

14MV27, registered to John F. Villavicencio.[10]   The other male got into a blue Volkswagen Jetta

with MA registration 75JW43.  Both the Infiniti and the Jetta left the area.

**F.      Surveillance of 290 Quarry Street, Quincy.**

After identifying 290 Quarry Street as a possible stash location for BRITO and

HUERTA, agents rented an apartment in the same apartment building for the purposes of

conducting surveillance.  On May 5, 2005, agents installed a video camera to record the activity

around Garage #9.  Agents reviewed the tape recordings on a nearly daily basis.  The camera

recorded HUERTA carrying in several heavy bags into both Garage #9 and 290 Quarry Street.

Based on these observations, and the fact that HUERTA resided at 42 Whitfield Street in

Dorchester, agents further believed that HUERTA and BRITO were using 290 Quarry Street as a

stash location.

For example, a review of the video camera's recordings revealed that on May 9, 2005, at

---

[9]Sgt. Quinn was not part of the regular surveillance team and DEA Group investigating BRITO and HUERTA.  Instead, Sgt. Quinn was providing assistance since he was in the area during the time.

[10]On May 18, 2005, agents conducted a consent search of this vehicle and found a hidden motorized compartment under the center console of the vehicle, typically used to store drugs and drug proceeds.  A certified and trained drug dog alerted to this hidden compartment.

approximately 5:47 p.m., a white Volvo station wagon, believed to be the same white Volvo station wagon saw on April 27th, backed into Garage #9.  The garage door then closed, but no one left the garage until approximately 6:04 p.m. when a male was observed pulling a black suitcase on wheels from the garage.

On May 17, 2005, at around 9:00 p.m., TFA O'Neil began conducting surveillance at 290 Quarry Street in Quincy.  By this time, BRITO had dropped the target telephone and the wiretap had ended the day before.  At around 9:35 p.m., TFA O'Neil saw the white Ford Taurus park in the rear parking lot of 290 Quarry Street.  HUERTA took two weighted bags, one white and one black, out of the white Taurus.  HUERTA continually looked around the lot as he walked quickly to the rear door of 290 Quarry Street.  At around 9:55 p.m., TFA O'Neil saw a black Infiniti I30, with MA registration 14MV27, park in the rear lot of 290 Quarry Street.  An Hispanic male (later identified as Malvin O. Velazquez), exited the Infiniti carrying a brown paper shopping bag with handles.  Velazquez, too, continually looked around and walked quickly to the rear of 290 Quarry Street.

On May 18, 2005, TFA O'Neil saw HUERTA, carrying a brown paper shopping bag with rope handles, exit the rear door of 290 Quarry Street and get into the white Ford Taurus.  Around the same time, Malvin Velazquez left the rear of 290 Quarry Street and got into the black Infiniti I30 (MA registration 14MV27).  The two cars drove to another parking lot only about a hundred yards away.  HUERTA got out of the white Taurus, still carrying the same brown paper shopping bag, and got into the black Infiniti.  Agents followed the Infiniti as it drove to HUERTA's residence at 42 Whitfield Street and dropped HUERTA off at his residence.

At approximately 12:05 p.m., at the request of TFA O'Neil, MSP Trooper John Fallon of

the K-9 Unit, stopped the black Infiniti on American Legion Parkway for a motor vehicle violation. Trooper Fallon identified the driver and sole occupant as Malvin Velasquez. Velasquez consented to a search of the vehicle.  During the search, Trooper Fallon found a hidden motorized compartment under the center console.  Trooper Fallon's K-9, which is certified in detection of narcotic odor, made a positive alert for the presence of narcotic odor in the area of the console.  The Black Infiniti was towed to the MSP barracks in Milton, MA.  Later that day, TFA O'Neil and Trooper Fallon opened the hidden compartment and found numerous air fresheners, but no drugs or contraband.

On June 22, 2005, at approximately 3:45 p.m., SA Hersey saw the white Taurus in the rear parking lot of 290 Quarry Street.  HUERTA got out of the Taurus carrying a weighted plastic bag and entered 290 Quarry Street.  About an hour later, SA Hersey saw HUERTA exit 290 Quarry Street carrying a black plastic weighted bag, get into the blue Saab and leave.[11]

SA Hersey and other agents followed the blue Saab to Roxbury.  TFA O'Neil saw HUERTA park the blue Saab and get out, carrying what appeared to be the same black plastic weighted bag.  He went into 69 Crawford Street.  About a half hour later, Boston Police Officer Robert Walsh saw HUERTA and an unidentified Hispanic male walk out of 69 Crawford Street. Officer Walsh saw that neither HUERTA nor the other male was carrying anything as they left the residence.

**G.     Surveillance in July 2005.**

Based on a review of the video tape for July 1, 2005, at about 10:00 a.m., an unknown male went into Garage #9.  A short time later the White Volvo left.  At about 9:30 p.m., the same

---

[11]According to statements which HUERTA gave to the police, Deborah Miranda was believed to have been HUERTA's girlfriend/spouse.

white Volvo returned and backed into the Garage #9.  An unknown male left the garage.  The following morning, July 2, 2005, at about 6:00 a.m., based on review of the surveillance video, HUERTA walked across the parking lot of 290 Quarry Street, pulling a large black suitcase, which he brought into Garage #9.  A short time later, the White Volvo pulled out and departed the area.  The white Volvo did not reappear until four days later on July 6, 2005.

On July 6, 2005, at about 7:15 p.m., SA Hersey saw the white Volvo return and drive into Garage #9.  SA Hersey saw HUERTA exit Garage #9, talk with an unknown Hispanic male in a grey Pacifica, MA registration 23PR41 (registered to Thrifty Car Rental) in the parking lot, and enter 290 Quarry Street with this unidentified male (UM).  A short time later, the two came out of the rear door of 290 Quarry Street, got into the Pacifica and left, with HUERTA driving.

Later that night on July 6th, TFA O'Neil saw the Pacifica, with HUERTA driving, and stop in front of HUERTA's residence at 42 Whitfield in Dorchester.  HUERTA got out of the Pacifica and into the Blue Saab.  Later, HUERTA returned to 290 Quarry Street in the Blue Saab.  HUERTA went into 290 Quarry Street and, a short time later, left and went into Garage #9.  Agents saw HUERTA move the car forward and then back in Garage #9.  Then the garage door closed and HUERTA came out and went into 290 Quarry Street.  At about 1:00 a.m., agents saw the Blue Saab parked at 42 Whitfield Street, indicating that HUERTA had returned to his residence.

**H.      Stop of the White Taurus on July 7, 2005**

On July 7, 2005, at approximately 8:00 a.m., DEA SA Mark Tully and TFA Kevin O'Neil began surveillance at 290 Quarry Street from the rented apartment.  Around this same time, agents reviewed the videotape from that morning.  The tape showed that at approximately

11

5:45 a.m., the blue Saab pulled into the parking lot, and entered Garage #9. At around 5:58 a.m., video showed HUERTA exiting the garage carrying a weighted bag. Following these observations from the video camera, agents maintained continuous surveillance of the parking lot of 290 Quarry Street.

At around 9:32 p.m., the blue Saab arrived and parked in the rear of the parking lot. SA Tully then saw HUERTA exit the Saab with a dark colored weighted bag and enter the rear of 290 Quarry Street. About ten minutes later, SA Tully saw HUERTA exit 290 Quarry Street carrying a small bag, walk to the blue Saab, and open the rear hatch. Around this same time, SA Tully saw the white Taurus pull up behind the blue Saab. SA Tully saw HUERTA remove a white bag from the rear of the blue Saab, then get into the driver's seat of the white Taurus as the only other occupant, later identified as BRITO, slid over to the front passenger seat. Agents followed the white Taurus as it left the parking lot of 290 Quarry Street.

TFA O'Neil contacted MSP Trooper Charles Kane of the K-9 unit to conduct a traffic stop of the white Taurus. Earlier that evening, TFA O'Neil informed Trooper Kane that the occupants of the white Taurus were the targets of an ongoing federal narcotics investigation. Trooper Kane was aware of the investigation and had assisted TFA O'Neil in conducting surveillance of other vehicles connected to HUERTA, including the blue Saab. At approximately 9:40 p.m., TFA O'Neil directed Trooper Kane to the area of the Furnace Brook Rotary.

A short time later, Trooper Kane spotted the white Taurus as it drove onto Interstate 93 southbound from the rotary. Trooper Kane saw that the vehicle failed to stay within the right travel lane, drifting into the breakdown lane twice. Trooper Kane stopped the white Taurus for

marked lane violation on Interstate-93 in Quincy near the Route 3 split.

Trooper Kane approached the white Taurus and asked the driver (HUERTA) and the sole occupant (BRITO) for their driver's licenses.  HUERTA gave Trooper Kane a New Hampshire driver's license in the name of Hector Colon, a name previously unknown to law enforcement agents. BRITO produced a driver's license in the name of Jose Navarro-Concepcion.  HUERTA (Colon) told Trooper Kane that he was driving from Boston to Brockton.   Trooper Kane ran a warrant and license check for both men, and also called TFA O'Neil.  TFA O'Neil told Trooper Kane that "Jose Navarro" was truly Wilgen Brito-Melo.  Trooper Kane wrote up a warning citation for a marked lane violation for the driver, Hector Colon (HUERTA) and returned to the vehicle.

Trooper Kane gave HUERTA the citation and asked him if he had anything in the car. HUERTA appeared nervous, so the trooper asked why.  HUERTA agreed to let Trooper Kane search the car.  Trooper Kane then asked both HUERTA and BRITO to step out of the car and wait by the guardrail, and also radioed for back up.  Two other MSP Troopers, Trooper Tom Duane and Trooper McDonald, responded to the request.  When Trooper Duane arrived at the scene a few minutes later, Trooper Kane instructed Trooper Duane to put the two occupants of the white Taurus (BRITO and HUERTA) in the backseat of his marked cruiser and to inform the occupants that they were not under arrest.  Trooper Duane did so, after doing a pat down search for weapons. Trooper Duane informed BRITO and HUERTA that they were not under arrest, but then orally advised them (in English) of their Miranda warnings from an advice-of-rights card Trooper Duane had in his cruiser.  When Trooper Duane asked BRITO and HUERTA if they understood their rights, one responded with a "yes" and the other nodded affirmatively.

13

Trooper Kane searched of the interior and the trunk of vehicle, but found no drugs or contraband. Trooper Kane also had his trained and certified drug dog, "Riggs," sniff through the interior of the car and the trunk but the dog did not alert. After finding no drugs or contraband inside the vehicle, Trooper Kane told TFA O'Neil about what had just occurred. After a short period of time, TFA O'Neil and DEA SA Tully asked Trooper Kane to drive to their location at 290 Quarry Street to run Riggs around the exterior of the blue Saab, which was still in the parking lot at 290 Quarry Street.

**I.      Dog "Sniff" of the Blue Saab and Garage #9.**

At approximately 10:30 p.m., Trooper Kane directed Riggs to sniff around the exterior of the blue Saab. Riggs alerted to the presence of a narcotic odor at the rear area of the Saab. After he alerted to the Saab, Trooper Kane had Riggs sniff around the door to Garage #9 and several other of garage doors immediately next to Garage #9. Agents did not attempt to open or move the door to Garage #9. Riggs alerted to the presence of narcotic odor at the door of Garage #9.

After Trooper Kane's drug dog alerted to the blue Saab and Garage #9, Trooper Kane contacted Trooper Duane and requested that Trooper Duane transport both BRITO and HUERTA back to 290 Quarry Street. At that time, Trooper Duane told BRITO and HUERTA that he would be transporting them to 290 Quarry Street in Quincy. At approximately 10:45 p.m., Trooper Duane transported BRITO and HUERTA in the back of his police cruiser back to 290 Quarry Street. Trooper McDonald drove the white Taurus back to 290 Quarry Street. Between the time that BRITO and HUERTA were pulled over at approximately 9:40 p.m. until 10:45 p.m., law enforcement agents never placed BRITO or HUERTA in handcuffs or drew their weapons.

**J.      Interview of HUERTA**

At about the time Trooper Duane was asked to bring the defendants to 290 Quarry Street, TFA O'Neil contacted DEA TFA Jaime Cepero, a native Spanish speaker, to request his assistance with an attempt to interview BRITO and HUERTA.  At the time, TFA Cepero, who is also a MSP Trooper, was in uniform working a construction detail in the area.  TFA O'Neil told TFA Cepero about the status of the investigation, and asked TFA Cepero to question BRITO and HUERTA about two vehicles located in the parking lot.

TFA Cepero arrived and went to HUERTA, who was siting in the back of the police cruiser without handcuffs.  TFA Cepero asked HUERTA to step out of the cruiser so he could speak with him.  BRITO stood off to the side outside the cruiser and likewise was not in handcuffs.

During the interview with TFA Cepero, which took place in Spanish, HUERTA again said that his name was Hector Colon and that he lived in New Hampshire.  According to TFA Cepero, HUERTA had to pause to answer some of these basic questions including his date of birth.  HUERTA said that he had driven down from New Hampshire that evening to meet his friend in Boston so HUERTA could lend his friend, "Navarro Concepcion," the Ford Taurus. HUERTA then said that the Taurus belonged to his girlfriend, Deborah Miranda.  After stating he was going to meet his friend in Boston, HUERTA said he was actually going to meet this friend at a gas station on the Furnace Brook Parkway in Quincy.

TFA Cepero next asked HUERTA about the blue Saab in the parking lot.  HUERTA said that the Saab also belonged to his girlfriend, Deborah Miranda, and that he had also driven the Saab down from New Hampshire that evening.  When TFA Cepero asked HUERTA how he

managed to drive two cars down from New Hampshire to Boston on the same day, HUERTA

said he dropped off the Saab in the parking lot and drove the Taurus to the gas station to meet his

friend.  TFA Cepero then asked HUERTA how he knew to drop off the Saab in this particular

parking lot.  HUERTA said that he had a friend who lived in the building.  HUERTA said his

friend's name was "Juan Antonio" and he lived in Apartment No. 704 (HUERTA had rented

Apartment No. 705).

After this, TFA Cepero showed HUERTA a set of keys that had been taken off

HUERTA's person.  HUERTA confirmed that the keys were his and that one of keys was the

key to the blue Saab.  Shortly thereafter, TFA Cepero told HUERTA that the investigating

officers were requesting HUERTA's consent to search the Saab and asked HUERTA if this

would be okay with him.  HUERTA responded by stating, "yes, no problem."  At that time, TFA

Cepero provided HUERTA with a DEA Form-88, Consent to Search form, in Spanish.

HUERTA read the form, indicated to TFA Cepero what it said, and signed the form in the name

Hector Colon.

## K.     Interview of BRITO.

After interviewing HUERTA, TFA Cepero turned to BRITO.  BRITO was standing

outside the police cruiser, with no handcuffs, and was away from the other officers.  He told

TFA Cepero that his name was Jose Concepcion and that he resided at 109 Kennedy Drive in

Malden (BRITO resided in Weymouth).  BRITO gave TFA Cepero a far different story than

HUERTA's versions of events.  BRITO said that he had agreed to pick up HUERTA at a the gas

station so he could accompany him to Brockton to help him work on a boiler.  TFA Cepero

asked BRITO if he knew his friend's name.  BRITO responded that he only knew him as

"Pinto," and that he had known him for about a year.

TFA Cepero then asked BRITO if he knew anyone in the building at 290 Quarry Street.
BRITO said that he did not know anyone in the building and that he did not know anything about
the cars in the parking lot.  BRITO said that he had never been to the lot before (even though law
enforcement agents had earlier observed BRITO at the lot).

**L.    The Search of the Blue Saab and the Seizure of Cocaine in the Hidden
        Compartment Found Inside the Saab.**

With HUERTA's consent, agents searched the blue Saab.  After a short time, TFA O'Neil
found a hidden motorized compartment behind the rear seat in the trunk area of the Saab.  Inside
the compartment, agents seized a tin foil ball containing cocaine.  Inside the same compartment,
agents also found three sets of Puerto Rican birth certificates and three matching social security
cards.

HUERTA was arrested for trafficking in cocaine.  At the same time, BRITO was arrested
for the outstanding deportation warrant.

**M. The Search Warrant Affidavits.**

After the arrests of BRITO and HUERTA, agents began the process of preparing a search
warrant application for 290 Quarry St., Apartment #705 (the "Quarry Street Apartment"), as well
as and Garage #9 of 290 Quarry Street, and for BRITO's home, 6123 Avalon Drive, Weymouth.

Both of the affidavits described the ongoing drug investigation, including the court-
authorized interceptions of the target telephone, used by Brito. Specifically, in each affidavit,
TFA O'Neil, one of the two case agents assigned to the investigation, described his 12 ½ years
of experience with the Massachusetts State Police, including his four years as a Task Force
Officer assigned to DEA.  <u>See</u> Ex. 1 to Def. Mem. (Affidavit in support of 290 Quarry St. Search

17

Warrant) ("Quarry St. Aff.") ¶¶1-6; Ex. 2 to Def. Mem. (Affidavit in support of 6123 Avalon

Drive Search Warrant) ("Avalon Aff.") ¶¶1-3.

As described in more detail above, TFA O'Neil also laid out many of the investigating

agents' observations made during the course of the wiretap, including a meeting between BRITO

and HUERTA on April 16, 2005 (Quarry St. Aff., ¶22; Avalon Aff., ¶13) and a series of

observations of bags, suitcases, and bundles being taken in and out of 290 Quarry Street by

HUERTA and others.  See Quarry St. Aff. ¶¶17-20, 24, 25, Avalon Aff. ¶¶26-29, 33, 34.  TFA

O'Neil also described the events of July 7, when the white Taurus was followed from 290

Quarry Street with HUERTA driving and BRITO in the passenger seat.  Quarry St. Aff. ¶25,

Avalon Aff. ¶34.  When the car was stopped by a State Trooper for a marked-lanes violation,

both BRITO and HUERTA gave the trooper false names and false identification.  Quarry St. Aff.

¶26, Avalon Aff. ¶35.  A subsequent consent search of the blue Saab yielded a hidden

compartment in the back of the car, containing cocaine and three sets of identifications,

apparently Puerto Rican birth certificates and social security cards.  Quarry St. Aff. ¶29, Avalon

Aff. ¶38.  The Saab also held mail addressed to 290 Quarry Street, Apartment 705.  Quarry St.

Aff. ¶30, Avalon Aff. ¶39.

## 1.    Affidavit in Support of Quarry Street Search Warrant.

TFA O'Neil described HUERTA's vague and misleading explanation of the blue Saab's

presence at 290 Quarry Street (his friend, he said, lived in the building, but he could not provide

the person's name; he gave the apartment number 704, next door to the apartment HUERTA

rented).  See Quarry St. Aff. ¶28.  Keys taken from HUERTA at the time of his arrest opened the

door to apartment 705, but not apartment 704.  Quarry St. Aff. ¶30.

18

###### 2.        Affidavit in Support of Search Warrant at 6123 Avalon Drive.

TFA O'Neil begins the factual portion of this affidavit by describing the earlier-issued search warrants and the results of those searches.  Specifically, he informed Magistrate Judge Swartwood that the search of the Quarry Street Apartment had turned up "approximately 7 kilograms of cocaine; a loaded 9-mm handgun, with an obliterated serial number; approximately $50,000 in U.S. Currency; a cocaine press, cocaine cutting agent, a scale, a grinder, and packaging materials[,]" as well as "a checkbook from Citizen's Bank in the name Jose Navarro." Avalon Aff. ¶9.  The return from the Quarry Street Apartment search warrant, made the day before, gave a more exhaustive list of the items seized from the Quarry Street Apartment, Apt. 705, including "bag containing misc. documents," "drug ledger/notebook," "check book," "2 social security cards," and "photographs," to name a few.  See Defendant's Supplemental Memorandum of Law ("Supp. Mem."),  Ex. 11 [docket no. 38].  These items were not included in the Avalon Affidavit.

TFA O'Neil also explained a series of conversations intercepted on the wiretap in which BRITO, HUERTA, and a third man, "Felipe," discussed what the TFA O'Neil understood to be the collection of a drug debt.  See Avalon Aff., ¶¶14-18.  TFA O'Neil described how the series of phone calls culminated in a meeting between HUERTA and "Felipe" in which HUERTA got a paper bag with handles, which HUERTA subsequently brought into 290 Quarry Street.

TFA O'Neil also described how BRITO had been identified as "Jose Navarro," the tenant at 6123 Avalon Drive.  See Avalon Aff., ¶¶21-22.  (BRITO now admits that he was the resident of this apartment.)  DEA had learned that BRITO ("Navarro") had originally applied for the apartment with another person, "Angel Rivera" (HUERTA), but had been declined.  Avalon

Aff., ¶22.

## II. <u>ARGUMENT</u>

BRITO, joined by HUERTA, contests each event in the chain of events noted above:  the stop of the white Taurus, the search of that car, the police officers' transportation of the defendants to 290 Quarry Street, the search of the blue Saab, and the (warrant-authorized) searches of both 290 Quarry Street, Apt. 705, and 6123 Avalon Drive. These arguments are addressed in turn below.

**A.    Defendant BRITO Has Failed to Demonstrate a Reasonable Expectation of Privacy ("Standing") in either the Blue Saab  or Apartment #705 at 290 Quarry Street in Quincy**.

"The Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy." <u>United States v. Lewis</u>, 40 F.3d 1325, 1333 (1st Cir. 1994); <u>United States v. Cruz Jiménez</u>, 894 F.2d 1, 5 (1st Cir.1990); <u>Rakas v. Illinois</u>, 439 U.S. 128, 140-50 (1978).  Showing such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis. <u>Cruz Jiménez</u>, 894 F.2d at 5 (citing <u>United States v. Salvucci</u>, 448 U.S. 83, 90-91 (1980)).  A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects cannot contest their search or seizure.  <u>United States v. Sánchez</u>, 943 F.2d 110, 113 (1st Cir.1991); <u>United States v. Gomez</u>, 770 F.2d 251, 253 (1st Cir.1985)(This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing). "[A] failure to present evidence with respect to such an expectation of privacy prevents a defendant from making a claim for suppression under the Fourth Amendment."  <u>United States v. Samboy</u>, 433 F.3d 154, 162 (1st Cir. 2005).

Factors relevant to the standing determination include "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Sanchez, 943 F.2d at 113.

In this case, BRITO has utterly failed to demonstrate any sort of reasonable expectation of privacy in the Blue Saab or the Quarry Street Apartment where cocaine, large amounts of cash and a firearm were discovered. There is no evidence that BRITO ever had any connection or ownership interest in the blue Saab. During months of surveillance, BRITO was never seen driving or riding in this vehicle as a passenger. See United States v. Elmore, 304 F.3d 557, 561-62 (6th Cir. 2002)(defendant lacked standing to challenge search of car stopped when he was not in the car and his possessory interest in the car could not be established). BRITO has not submitted any factual support for a claim of standing with respect to the blue Saab or its contents. See Lewis, 40 F.3d at 1333 (defendants may have had a reasonable expectation of privacy in the contraband, but failed to assert it by swearing out any affidavits with respect to such an expectation). Instead, the Saab was driven by HUERTA and registered to Deborah Miranda who, according to HUERTA's statements, is HUERTA's girlfriend. Moreover, when TFA Cepero asked BRITO if he had any knowledge of any of the vehicles in the parking lot at 290 Quarry Street, BRITO disavowed any connection to any of the cars in the parking lot and said that he had never been to that lot before. Therefore, the government understands that BRITO does not contend that he has standing to suppress the search of the blue Saab.

Similarly, BRITO has failed to demonstrate any reasonable expectation of privacy in the

Quarry Street Apartment.  The apartment and the garage were rented by HUERTA.  At best, BRITO was an occasional guest of HUERTA's, in connection with their joint drug business.  See Minnesota v. Carter, 525 U.S. 83, 91 (1998)(no reasonable expectation of privacy and thus no standing to challenge admissibility fo drug evidence seized on premises where defendant was merely a short-term guest for entirely commercial purposes); United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998)(defendant lacked standing to challenge search because he was only a casual visitor to the apartment searched); United States v. Harrison, 103 F.3d 986, 989 (D.C. Cir. 1997)(defendant lacked standing to challenge the admissibility of drugs discovered in apartment where defendant stored drugs, but did not reside at apartment and was not a guest).

Accordingly, BRITO cannot seek to suppress any of the evidence seized from the blue Saab or the Quarry Street Apartment because he has failed to demonstrate any reasonable expectation of privacy.

**B.     Police Lawfully Stopped the White Taurus.**

Defendants argue that the police stopped the white Taurus without legal justification. Defendants' argument is wrong for three independent reasons.  First, Trooper Kane saw the white Taurus commit a traffic infraction, and so had probable cause to believe that the driver of the white Taurus had committed a traffic violation.  Second, at the time of the traffic stop, the DEA had probable cause to believe that BRITO was illegally present in the United States, had been ordered deported by the INS, and was using a fraudulent identification to conceal his identity.  Agents, therefore, had probable cause to arrest BRITO.

Third, prior to the traffic stop, the DEA had been investigating BRITO since at least January, 2005, and had uncovered evidence that BRITO and HUERTA were actively involved in

the distribution of narcotics and were using the white Taurus in connection with that criminal activity. Under the "collective knowledge" rule, the facts and circumstances leading up to the stop of the white Taurus are imputed to Trooper Kane, who was participating in the investigation.

> **1.      The Stop of the White Taurus Was Supported By Probable Cause that the Driver had Committed a Traffic Violation.**

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Officers who have probable cause to believe that a motorist has violated a traffic law may temporarily detain that motorist, even if a reasonable officer would not ordinarily stop that motorist for such an infraction without some other law enforcement motivation. See Whren, 517 U.S. at 810-812; Delaware v. Prouse, 440 U.S. 648, 653 (1979); Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

"To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau-the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); see also United States v. Sowers, 136 F.3d 24, 27 (1st Cir.1998); Terry v. Ohio, 392 U.S. 1, 20 (1968). "[W]hile an officer's actions must bear some relation to the purpose of this original stop, he may shift his focus and increase the scope of the investigation by degrees if his suspicions mount during the course of the detention." Chhien, 266 F.3d at 6. "The effort to locate a particular sequence of events along the continuum of detentions begins with a determination as to whether the officer's

actions were justified at the inception." <u>Sowers</u>, 136 F.3d at 27, <u>citing</u> <u>Terry</u>, 392 U.S. at 19-20,

<u>United States v. McCarthy</u>, 77 F.3d 522, 530 (1st Cir.1996).

Here, the stop of the white Taurus was justified at its inception.  Trooper Kane saw the

white Taurus commit a traffic infraction in violation of M.G.L. c. 89, §4A.  <u>See</u> <u>United States v.</u>

<u>Henderson</u>, 229 F.Supp.2d. 35, 40 (D.Mass. 2002)(police officer had probable cause to stop

vehicle in which defendant was passenger because officer had observed vehicle crossing center

line at least twice, a violation of M.G.L. c. 89, §4A, and officer received information that license

of vehicle's owner had been suspended).  Furthermore, as defendant now concedes, Trooper

Kane did in fact issue a citation to HUERTA for a marked lane violation.[12]  Defendant

nevertheless contests that there was no traffic infraction, thus creating a factual issue for the

court to decide.

In support of their argument that a traffic violation did not occur, the defendants rely

heavily on this court's decision in <u>United States v. Sugar</u>, 322 F.Supp.2d 85 (D.Mass. 2004).  In

that case, this Court held that a marked lane violation was not a violation of Missouri law, thus

invalidating the legal basis for the initial stop.  <u>Id.</u> at 91.  In particular, the Court reasoned that

the precise wording of the Missouri statute, which commanded that the "vehicle shall be driven

*as nearly practicable* entirely within a single lane" (emphasis supplied), indicated that the statute

did not comprehend minor swerving.  <u>Id.</u> at 91.

The language of the Massachusetts statue is quite different.  Massachusetts General Law,

Chapter 89, Section 4A states in pertinent part:

---

[12]The original of this traffic citation was found inside HUERTA's wallet on his person during the booking
procedures at Norfolk County House of Corrections and was thereafter transferred to the DEA.  It was documented
as DEA Exhibit N-41 which was described in a DEA 7a report disclosed to defendant in automatic discovery.

> When any way has been divided into lanes, the driver of a vehicle *shall so drive* that the vehicle *shall be entirely* within a single lane and he *shall not* move from the lane in which he is driving *until* he has first ascertained if such movement can be made with safety.

M.G.L., c. 89, §4A (emphasis supplied).

In contrast to the Missouri statute, the Massachusetts statute contains unambiguous, direct language. The driver is not permitted to (and "shall not") move from the marked lane until he first does something affirmatively: ascertains that such movement can be made "with safety."

Defendant also argues that the initial stop of the white Taurus was unlawful because it was "clearly pretextual." Defendant's Memorandum in Support of Motion to Suppress ("Def. Mem.") 9. Specifically, defendant states that the traffic stop was the result of a frustrated, fruitless investigation and attempts to attribute improper motives to the law enforcement agents in their attempt to "effectuate a pretextual stop of the vehicle, hoping to get lucky." Def. Mem. 14. Defendant's argument is fatally flawed as a matter of law.

The subjective intentions of the officer making the traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis." Wren, 517 U.S. 806, 814; Ohio v. Robinette, 519 U.S. 33, 39 (1996); Arkansas v. Sullivan, 532 U.S. 769, 771 (2001)(per curiam)(arrest of narcotics suspect for speeding, lack of documentation, and tinted windows valid despite officer's intention to use arrest to find drugs during inventory search); Florida v. Royer, 460 U.S. 491, 507 (1983)(arrest valid when probable cause exists even if police don't subjectively believe that probable cause exists). In fact, as stated by the First Circuit:

> "*Wren's* 'objective' standard in Fourth Amendment cases seemingly makes subjective intent motive irrelevant in all such cases; not only can the police invoke a minor traffic violation for an arrest actually prompted by other law-enforcement aims (*e.g.,* the driver is a known drug dealer whom the police wish to surveill) but it is even irrelevant – at least under

the Fourth Amendment[].

Bolton v. Taylor, 367 F.3d 5, 10 (1st Cir.2004)(internal citations omitted).

    2.    **There Was Probable Cause to Arrest BRITO at the Time of the Traffic Stop on July 7, 2005 Based on An Outstanding Deportation Warrant and BRITO's Use of a Fraudulent Identification.**

Independent of the traffic violation which Trooper Kane saw, as further described below, at the inception of the investigatory stop, there was probable cause to arrest BRITO for an outstanding administrative deportation warrant and his use of a fraudulent identification to conceal his true identity.

Law enforcement agents had been investigating BRITO since approximately January 2005. Collectively, the officers knew the following facts: Based on information from a confidential informant, BRITO had been involved in the distribution of large quantities of cocaine since at least 1996. According to telephone records, agents connected BRITO's cell phone to a seizure of sixty (60) kilograms of cocaine in New York City in November 2004. Through further investigation, agents determined that BRITO was illegally present in the United States, had been ordered deported by the INS in 1996, and that there was an outstanding administrative deportation warrant for his arrest and deportation from the United States.

After the investigation began in January 2005, investigators determined that BRITO was a using fraudulent identification in the name of Jose Navarro-Concepcion. BRITO used this fraudulent Massachusetts driver's license to obtain an apartment in Weymouth and to rent a Dodge Durango. Doing so is a violation of both state law, see M.G.L., c. 90, §24B, and federal law, See 18 U.S.C. §1028(a)(7).

"Probable cause" to search is "a fair probability that contraband or evidence of a crime

will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  It is a fluid

concept that turns on the assessment of probabilities in particular factual concepts.  <u>Id</u>. at 232.

For this reason, "the evidence thus collected must been seen and weighed not in terms of library

analysis by scholars, but as understood by those versed in the field of law enforcement." <u>Id</u>. at

231-32.

      To establish probable cause, the government "need not present the quantum of proof

necessary to convict." <u>United States v. Torres-Maldonado</u>, 14 F.3d 95, 105 (1ˢᵗ Cir.

1994)(quoting <u>Uricoechea-Casallas</u>, 946 F.2d at 165). <u>See also</u> <u>United States v. Morris</u>, 977 F.2d

677, 684 (1st Cir.1992) (same); <u>United States v. Figueroa</u>, 818 F.2d 1020, 1023 (1st Cir. 1987)

(same). "Rather, it need only show that at the time of the arrest, the facts and circumstances

known to the arresting officers were sufficient to warrant a prudent person in believing that the

defendant had committed or was committing an offense." <u>United States v. Martinez-Molina</u>, 64

F.3d 719, 726 (1ˢᵗ Cir. 1995); <u>Torres-Maldonado</u>, 14 F.3d at 105.  In assessing probable cause,

the court must look at the "totality of the circumstances." <u>Gates</u>, 462 U.S. at 238; <u>United States</u>

<u>v. Link</u>, 238 F.3d 106, 109 (1ˢᵗ Cir. 2001).  In this case, at the time of the traffic stop of the white

Taurus in which BRITO was a passenger, there was probable cause to believe that BRITO was

committing violations of both federal and state law, for which law enforcement were authorized

to arrest him without an arrest warrant.  <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 418, 422

n.11 (1996); <u>Carroll v. United States</u>, 267 U.S. 132, 156, 161-62 (1925)(warrantless arrest lawful

because police stopped car and arrested occupants upon probable cause that occupants had

committed a felony).  These facts alone were sufficient justification for the police to conduct a

stop of the white Taurus and take BRITO into custody.  "Once an officer has probable cause to

believe a suspect is committing a crime, he may stop a car and arrest the suspect without a

warrant." United States v. Arzate-Nunez, 18 F.3d 730, 734 (9th Cir. 1994)(probable cause to stop

automobile based on their justified belief that *passenger* had reentered the country after being

deported); see also United States v. Rodriguez-Suazo, 346 F.3d 637 (6th Cir. 2003)(probable

cause to detain an arrest defendant for illegal reentry after deportation, even though search of

vehicle pursuant to search warrant revealed no evidence of drug dealing; defendant produced a

fraudulent license and admitted he was an illegal immigrant).

   3.     **There Was Reasonable Suspicion to Conduct a *Terry* Stop of the White
          Taurus Based Upon the Ongoing Drug Investigation.**

   While probable cause is required for a search or seizure, under Terry v. Ohio, law

enforcement officers may lawfully initiate an investigatory detention, a brief seizure by the

police, if they have reasonable, articulable suspicion that a person is engaged in criminal activity.

Terry v. Ohio, 392 U.S. 1, 21 (1968)(an investigatory detention is valid if the police state

"specific and articuable facts which, taken together with rational inferences from those facts"

justify intrusion).  In particular, when the police reasonably suspect that a person is engaged in

criminal activity, law enforcement officers may stop that person, question that person for a

limited period of time, and frisk that person for weapons.  Terry, 392 U.S. at 22-24.

When a police officer makes "brief investigatory stops of persons and vehicles that fall short of

traditional arrest ... the Fourth Amendment is satisfied if the officer's action is supported by

reasonable suspicion that criminal activity may be afoot," United States v. Arvizu, 534 U.S. 266,

273 (2002) (internal quotation marks omitted), or if there is "reasonable suspicion, grounded in

specific and articulable facts, that [the stopped] person . . . was involved in or is wanted in

connection with a completed felony," United States v. Hensley, 469 U.S. 221, 229 (1985).

"Reasonable suspicion [] is an intermediate standard and one that defies precise definition." Chhien, 266 F.3d at 6. "Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances." Id. at 6. To justify an investigatory detention, the government must point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest that criminal activity has occurred or is imminent. Terry, 392 U.S. at 21. Inarticulable hunches or generalized suspicions are insufficient. See United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003)(detention unreasonable when police stopped occupying car with out-of-state plates in parking lot near location of crime).

Like the probable cause analysis, reasonable suspicion is gauged on the totality of the circumstances. Arvizu, 534 U.S. at 273 (internal quotation marks omitted). The government bears the burden of showing such a basis. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion); Brown v. Texas, 443 U.S. 47, 52 (1979).

In Ornelas v. United States, 517 U.S. 690, 695 (1996), the Supreme Court explained that the determination of probable cause and/or reasonable suspicion is twofold. First, the court must determine the "historical facts," the events that occurred leading up to stop or search. Id. at 695. Second, the court must decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to probable cause or reasonable suspicion. See United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).

In this case, in March 2005, based in part on information from a confidential informant that BRITO was involved in drug trafficking, and based on his connection to a seizure of sixty kilograms of cocaine in New York, DEA began intercepting one of BRITO's cell phones

pursuant to a federal Title III wiretap. During this wiretap, BRITO was intercepted on multiple occasions speaking with Pinto about the collection of drug proceeds. In April 2005, agents determined through wire interceptions and physical surveillance that Pinto had rented an apartment at 290 Quarry Street in Quincy in the name of Angel Resto-Rivera, an apartment different from his residence at 42 Whitfield in Dorchester.

During the course of physical surveillance between April 2005 and late June 2005, agents saw HUERTA driving the white Taurus in connection with drug related activity. On April 23, 2005, HUERTA was observed driving the white Taurus to a gas station in the area of the Furnace Brook Rotary in Quincy. Wiretap calls revealed that HUERTA was there to pick up a quantity of drug proceeds from "Felipe." On May 17, 2005, HUERTA was observed removing two large weighted bags from the white Taurus and carrying them into 290 Quarry Street, the suspected stash location. The next day, on May 18, 2005, HUERTA was observed placing a brown paper shopping bag with rope handles into the white Ford Taurus after exiting 290 Quarry Street. Around the same time, HUERTA met up with Malvin Velazquez, who was driving a black Infiniti, in the parking lot of 290 Quarry Street. HUERTA and Velazquez then drove to another parking lot about a hundred yards away. After Velazquez dropped HUERTA off at his residence at 42 Whitfield Street, police officers stopped the black Infiniti and agents discovered a hidden motorized compartment, typically used to hide money and drugs, under the center console. During a search, a certified drug dog altered the hidden compartment. On June 22, 2005, HUERTA was again observed removing a weighted plastic bag from the white Taurus and carrying it into 290 Quarry Street.

Based in part on the above facts, agents believed that HUERTA was renting the

apartment and garage at 290 Quarry Street in Quincy for the purpose of storing narcotics and

drug proceeds.  Such observations and conclusions are afforded considerable deference, since an

experienced officer can infer activity from conduct that seems innocuous to a lay observer.  See

Arvizu, 534 U.S. at 277 (reasonable suspicion to stop vehicle because border patrol agent

inferred from his observations, registration check, and experience that defendant was avoiding

border patrol agents and children's elevated knees suggested concealed cargo); Ornelas, 517

U.S. at 700 (officer may draw inferences based on experience; veteran officer who had searched

roughly 2,000 cars could see loose car panel as evidence of hidden drugs).

    After identifying 290 Quarry Street as a possible stash location, agents rented an

apartment in the same building and set up a video camera to record the activity in front of

Garage #9.  While BRITO and HUERTA were never caught on tape with cocaine visible in their

hands, law enforcement agents saw what they reasonably believed to be narcotics activity.  For

example, on May 9, 2005, the camera recorded a white Volvo entering HUERTA's garage,

Garage # 9. The garage door closed, but for no apparent reason the driver of the vehicle

remained inside the garage for approximately fifteen minutes.  After fifteen minutes, an

unidentified male was observed pulling a black suitcase on wheels from the garage.  On July 1,

2005, the camera recorded the same white Volvo entering Garage #9.  The next day, July 2,

2005, the camera recorded HUERTA pulling a large black suitcase into Garage #9.  A short time

later, the white Volvo pulled out and left the area.

    Based on these observations, and their training and experience, agents believed that the

white Volvo contained a hidden compartment and that HUERTA and others were using the

white Volvo to transport narcotics and/or drug proceeds.  This conclusion was more than a mere

hunch. Based on wiretap calls, agents knew that HUERTA had collected drug proceeds for BRITO and had brought them back to 290 Quarry Street. Agents also knew from a confidential informant and surveillance that BRITO typically obtained his cocaine from New York and often traveled to New York to conduct his drug business. Moreover, on May 18, 2005, agents found a hidden compartment in a black Infiniti shortly after the driver of the vehicle met with HUERTA at 290 Quarry Street.

The white Volvo reappeared at 290 Quarry Street on the evening of July 6, 2005. At that time, the white Volvo drove back into Garage #9 and agents saw HUERTA and another unidentified male who was driving a grey Pacifica exit Garage #9. Later that night, HUERTA returned to Garage #9 and was observed going back into the garage. The next day, according to the video camera recording, HUERTA returned to 290 Quarry Street and Garage #9 at around 5:45 a.m. At around 5:58 a.m., the video showed HUERTA exiting Garage #9 carrying a weighted bag. Later that evening, agents saw BRITO arrive at 290 Quarry Street in the white Taurus. HUERTA got into the driver's seat of the white Taurus (BRITO apparently slid over), carrying an a white bag that HUERTA had taken out of the blue Saab.

After the white Taurus departed 290 Quarry Street, the suspected stash location, TFA O'Neil contacted Trooper Kane to follow the white Taurus and to conduct a traffic stop. Trooper Kane began following the white Taurus, based on TFA O'Neil's request, as part of a joint investigative effort.

### a.    The Fellow-Officer/Collective Knowledge Rule.

"Under the 'fellow-officer' rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the

conclusion that a suspect has committed or is committing a crime." United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997); See United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999)("In determining whether there is probable cause to conduct a search or reasonable suspicion to conduct a *Terry* stop, "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation."); United States v. Ventresca, 380 U.S. 102, 111, (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number").

Thus, when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, courts have imputed to the arresting officer the directing officer's knowledge. Meade, 110 F.3d at 193-94; see United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002)("common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop"). The officer making the stop is thus permitted to reasonably rely upon the information from his fellow officers requesting the stop. United States v. Paradis, 802 F.2d 553, 557 (1st Cir.1986)(upholding arrest ordered by superior although the arresting officer himself may have lacked probable cause). The "collective knowledge" or "fellow officer" rule applies to Terry stops. See Cook, 277 F.3d at 86-87; United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005)("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [defendant's] vehicle, and such knowledge was imputed to the officer at the scene when he received [the] radioed request").

Here, Trooper Kane was permitted to reasonably rely on the DEA's request to conduct an investigatory stop of the white Taurus.  Based on the "totality of the circumstances," see Arvizu, 534 U.S. at 273, from the "historical facts," see Ornelas, 517 U.S. at 695, there was sufficient reasonable suspicion to conduct a *Terry* stop of the white Taurus.  See Bolton v. Taylor, 367 F.3d at 9 ("[T]he required level of suspicion for a *Terry* stop and brief inquiry is fairly low").

Furthermore, as further described below, after the initial stop of the vehicle, the facts that developed - including HUERTA's use of a fraudulent identification, their conflicting statements to the police, and the positive dog alert to the blue Saab and the door to Garage #9 - justified extending the scope and duration of the *Terry* stop.

## C.     The Scope of the *Terry* Stop Was Reasonably Related to the Purpose of the Investigatory Detention

Defendants claim that they were detained for so long that they were subjected to a "de facto" arrest, and that the search of the blue Saab was therefore impermissible.  This argument must be rejected.  Defendants' detention during the developing law-enforcement activities was justified by the developments in the case.

Analysis of whether the defendants were "arrested" is also subject to a totality of the circumstances test.  Where the circumstances show that a reasonable person would understand that he was being held to "the degree associated with a formal arrest," he may be said to have been arrested, even if no formal arrest was made.  Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam).  "Relevant factors bearing on whether an investigatory stop has evolved into a de facto arrest include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical

34

restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005)(internal quotations and citations omitted). As described below, neither defendant was subjected to the type of law-enforcement actions that would convert their detention into a de-facto arrest.

Instead, the defendants' continued detention was reasonably related to the circumstances that initially justified the detention. See Terry, 392 U.S. at 20; United States v. Sharpe, 470 U.S. 675, 682 (1985); Texas v. Brown, 460 U.S. 730, 739 (1983). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983).

If reasonable suspicion exists, the police may detain a person to ascertain his identity, see Adams v. Williams, 407 U.S. 143, 146 (1972); Terry 392 U.S. at 6-7, 22-23, and may order occupants out of a vehicle they have lawfully detained. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1997)(per curiam)(officer may order driver to step out of car during routine Terry stop of vehicle); Maryland v. Wilson, 519 U.S. 408, 410 (1997)(officer may order all passengers out of car pending completion of traffic stop).

Here, there is no question that Trooper Kane's questions were brief and directly related to the traffic stop. Trooper Kane simply asked the occupants for their identifications and asked where they were going. The answers to those questions only heightened his suspicion. BRITO gave an identification in the name "Jose Navarro-Concepion," and HUERTA also produced identification that did not match the agents' expectations. He gave Trooper Kane a New Hampshire driver's license in the name of Hector Colon, when he had rented the Quarry Street

35

Apartment as "Angel Resto-Rivera."   After receiving this license, Trooper Kane confirmed with TFA O'Neil that agents believed Colon's (HUERTA's) true name was Angel Resto-Rivera.

As result of this continued detention, defendant argues that the subsequent "sniff search" of the blue Saab was unlawful.  This portion of defendant's argument is fundamentally flawed for several reasons.  First, even though defendants were not in custody at the time of their questioning by TFA Cepero, defendant were nonetheless advised of their <u>Miranda</u> warnings prior to any type of interrogation by Trooper Duane.  Therefore, the statements, made post-<u>Miranda</u>, are admissible and were lawfully obtained.  Second, even if the statements had been made in violation of <u>Miranda</u>, under <u>United States v. Patane</u>, 542 U.S. 630, 643 (2004), the failure to give a suspect <u>Miranda</u> warnings does not require suppression of the physical fruits of a suspect's unwarned but voluntary statements.

Third, under the totality of the circumstances, the defendants were never in custody.  Prior to the discovery of the cocaine in the blue Saab, defendants were never handcuffed and the police never drew their weapons.  See <u>Fornia-Castillo</u>, 408 F.3d at 63 ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid <u>Terry</u> stop into a de facto arrest"); <u>Trueber</u>, 238 F.3d at 94 (officer's drawing of weapon while asking suspected narcotics trafficker to step out of vehicle at night does not transform entire investigatory stop into de facto arrest); <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 18 (1st Cir.1998) (the "use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest").  While it is true that defendants were transported to 290 Quarry Street from the scene of the traffic stop, defendants were transported to a large public parking lot, not the station house or an interview room.  <u>Compare</u> <u>Acosta-Colon</u>, 157 F.3d at 15 (stop converted to custodial arrest

because officers transported suspect in handcuffs to small interrogation room); United States v. Martinez, 808 F.2d 1050, 1055 (5th Cir. 1987)(custodial arrest occurred because, after investigative automobile stop, suspects were transported to police headquarters).

Fourth, even assuming that there had been a de facto arrest, requiring probable cause, law enforcement agents had probable cause to believe that both BRITO and HUERTA were using fraudulent identifies.

**D.    Even If the Initial Stop of the White Taurus and Defendants' Continued Detention Was Unlawful, the Seizure of the Cocaine in the Blue Saab Was Obtained Through an "Independent Source"**

Under the "independent source doctrine," even if police engage in illegal investigatory activities, evidence will be admissible if it is discovered through a source independent of the illegality. Murray v. United States, 487 U.S. 533, 537 (1988); see also Nix v. Williams, 467 U.S. 431, 443 (1984); Wong Sun v. United States, 371 U.S. 471, 487 (1963)("[T]he exclusionary rule has no application [when] the Government learned of the evidence from an independent source.") "The independent source doctrine acts as a limitation on the exclusionary rule of the Fourth Amendment."  United States v. Dessesaure, 429 F.3d 359, 365 n.6 (1st Cir. 2005).  The principle behind this doctrine is that although the government should not profit from its misconduct, it also should not be made worse off than it would have been had the misconduct not occurred.  Id. at 537; see United States v. Almonte, 952 F.2d 20, 23 (1st Cir. 1991)(search warrant upheld when no mention was made of prior illegal entry in warrant application); United States v. Veillette, 778 F.2d 899, 903-04 (1st Cir. 1985)(evidence admissible because search warrant application contained sufficient independent evidence to support probable cause).

Here, there were two independent sources for the seizure of cocaine in the blue Saab.

First, HUERTA consented to a search of the blue Saab and did so in writing in his native language. Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir.2000). Whether consent was voluntary or the result of coercion is a question of fact to be determined from an examination of the totality of circumstances. United States v. Twomey, 884 F.2d 46, 51 (1st Cir.1989) (citation omitted). Factors to be considered include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics. Id. at 51. In this case, the government will demonstrate through the testimony of TFA Cepero that HUERTA gave valid consent to search the Saab.

Second, while the blue Saab was parked in a large, public parking lot, Trooper Kane's certified and trained drug dog alerted to the odor of narcotics in the Saab. Trooper Kane and his dog were in a public place, where they were legally entitled to be. See United States v. Place, 462 U.S. 696 (1983) ("the important factor in applying *Place* is not whether the sniff occurs in a public place like an airport, but whether [ ]the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence"); United States v. Esquilin, 208 F.3d 315, 318 (1st Cir. 2000)(quoting United States v. Reed, 141 F.3d 644, 649 (6th Cir.1998)).[13]

Once the drug dog alerted to the rear of the Saab, together with the other facts developed

---

[13]While the First Circuit in United States v. Quinn, 815 F.2d 153, 159 (1st Cir. 1987) indicated that "reasonable suspicion" was required for a dog sniff, the Supreme Court more recently has indicated that a defendant has no reasonable expectation of privacy in sniff in the exterior their vehicle. See Illinois v. Caballes, 543 U.S. 405, 408-09 (2005)(holding that a dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment).

during the investigation, there was probable cause to search the car. <u>See</u> <u>United States v. Carter</u>, 300 F.3d 415, 422 (4th Cir. 2002)(per curiam)(probable cause to search defendant's trunk after sniff dog alerted to contraband; alert was sufficiently close to trunk); <u>United States v. Cedano-Arellano</u>, 332 F.3d 568, 573 (9th Cir. 2003)(per curiam)(probable cause to search defendant's gas tank after narcotics dog alerted to presence of drugs); <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003)(probable cause to conduct warrantless search based on multiple positive alerts given to officers by drug dogs).

**E.      The Search Warrants Were Properly Granted and Should Not Be Suppressed.**

BRITO argues that the search warrants that issued both for 290 Quarry Street, Apartment 705 (the "Quarry Street Apartment") and for BRITO's residence at 6123 Avalon Drive, Weymouth, were unsupported by the needed "substantial basis"; furthermore, he argues, the magistrate who issued the warrants was misled because there were "material omissions" in the Avalon Drive affidavit. <u>See</u> Def. Mem at 15-19; Supp. Mem. <u>passim.</u>  Therefore, BRITO argues, the searches of both the Quarry Street Apartment stash house and his apartment must be suppressed, and are not saved by <u>Leon</u>'s good-faith exception.

As more fully set out below, the affidavits in support of the search warrants for the Quarry Street Apartment and 6123 Avalon Drive were amply supported by probable cause and should be upheld.  In the alternative, if the Court should find that probable cause was lacking, the "good faith exception" articulated in <u>United States v. Leon</u>, 468 U.S. 897 (1984) dictates that the evidence nonetheless be admitted.

**1.      Standard of Review.**

"[A] magistrate's determination of probable cause should be paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983) quoting Spinelli v. United States, 393 U.S. 410, 419,(1969)). Where, as here, a defendant challenges a probable cause determination, the reviewing court should simply ensure that the magistrate had a substantial basis for concluding that probable cause existed. See United States v. Taylor, 985 F.2d 3, 5 (1st Cir. 1993); United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999); United States v. Procopio, 88 F.3d 21, 25 (1st Cir. 1996). Even in doubtful or marginal cases, reviewing courts still defer to an issuing magistrate's "probable cause" determination. See United States v. Ventresca, 380 U.S. 102, 107 (1965); Rosencranz v. United States, 356 F.2d 310, 316 (1st Cir. 1997) ("The Supreme Court made it perfectly clear that . . . doubtful cases should be resolved in favor of the warrant.")

As the First Circuit has emphasized, "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity. Courts should not subject the affidavit to *de novo* review and should give 'great deference' to the magistrate's determination of probable cause." United States v. Ciampa, 793 F.2d 17, 22 (1st Cir. 1986) (internal citations omitted).

## 2.    The Affidavits.

A warrant application must meet two requirements. It "must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005), citing Feliz, 182 F.3d at 86.

BRITO does not contend that heavy bags weren't being moved in and out of 290 Quarry Street with some regularity, nor that he and HUERTA didn't have the cagey conversations reported in the affidavits. Neither defendant argues that they were not using the 290 Quarry

Street location, or that BRITO did not live at 6123 Avalon Drive. Instead, BRITO appears to argue that the magistrate judge should not have credited TFA O'Neil's interpretations of these events, calling his observations "speculative" and his interpretations "unwarranted." Def. Mem. 17.

The totality of the circumstances described in the O'Neil affidavits were sufficient to allow Judge Swartwood to conclude that BRITO and HUERTA were involved in drug-dealing. Two cars associated with them (the blue Saab and the black Infiniti) had been the subject of positive "hits" by trained drug-detection dogs. Although no drugs were found in a subsequent search of the Infiniti, a hidden compartment was found, and it contained air fresheners. Both hidden compartments and air fresheners are, in TFA O'Neil's experience, consistent with drug-dealing. Id. The drug-dog's alert does not equate to a "false positive" by the dog. If drugs had been present in the car, and had been removed, the dog would likely have alerted, just as he did. See, e.g., United States v. Boxley, 373 F.3d 759, (6th Cir. 2004) (trained drug dog's alert "indicates that narcotics are present in the item being sniffed *or have been present* in such a way as to leave a detectable odor.") (emphasis added). Cocaine was found in the Saab's hidden compartment.

In addition to the two dog "hits," and the hidden compartments in both cars, Magistrate Judge Swartwood was entitled to rely on the unusual behavior that agents had observed, and that TFA O'Neil reported in his affidavits. For example, HUERTA came and went from 290 Quarry Street, bearing heavy packages, both very early in the morning (e.g., 5:45 a.m.) and late at night (e.g., 9:35 p.m.). Other men, both unknown and unidentified, were also seen coming going from the garage that HUERTA had rented, sometimes with heavy packages.

Agents also saw the men switch cars around; the affidavits reveal that, between the two

41

of them, they used a total of at least five vehicles during the course of the three-month surveillance.  See Quarry St. Aff. ¶14, Avalon Aff. ¶23 (BRITO, Oldsmobile Intrigue); Quarry St. Aff. ¶16, Avalon Aff. ¶25 (HUERTA, white Taurus); Quarry St. Aff. ¶18, Avalon Aff. ¶27 (HUERTA, white Taurus/black Infiniti); Quarry St. Aff. ¶22 (HUERTA, grey Pacifica).  On more than one occasion, a person would be seen driving two different cars within the space of an hour.  E.g., Quarry St. Aff. ¶20, Avalon Aff. ¶29 (HUERTA seen driving white Taurus, shakes surveillance, then is seen approximately 30 minutes after returning to 290 Quarry Street, leaving in blue Saab); Quarry St. Aff. ¶22, Avalon Aff. ¶31 (Pacifica); Quarry St. Aff. ¶23, Avalon Aff. ¶32 (HUERTA gets out of Pacifica and into blue Saab; later moves white Volvo within 290 Quarry St. garage); Quarry St. Aff. ¶25, Avalon Aff. ¶34 (HUERTA arrives in blue Saab, goes inside with heavy bag; comes back out ten minutes later with a different heavy bag, which he puts in the Saab, takes another bag from the rear of the blue Saab and gets in driver's seat of white Taurus, in which BRITO has just arrived).

BRITO and HUERTA's conversations also supported the conclusion that they were dealing drugs.[14]  The conversations were, admittedly, somewhat opaque, but it is the rare drug-dealer who survives for long by speaking frankly.  As interpreted by TFA O'Neil, some of the calls about "cars" were discussions of cocaine in various stages of street-readiness.  Avalon Aff. ¶14 &n.3.  Calls about "18 pesos" and putting together "20" need little interpretation, particularly when BRITO had earlier slipped and referred to "that money."  Avalon Aff. ¶16, ¶14.

---

[14] These conversations are described in the affidavit in support of the search warrant for 6123 Avalon Drive, but not in the affidavit in support of the Quarry Street Apartment warrant.

In short, BRITO and HUERTA were dealing drugs. They were using multiple cars with hides, one of which had drugs in it when searched, and the other of which had air fresheners, an indicator that drugs had been present. See, e.g., United States v. Patterson, 65 F.3d 68, 71 (7th Cir. 1995) (smell of air freshener added to probable cause); United States v. West, 219 F.3d 1171, 1178-79 (10th Cir. 2000) ("[t]he scent of air freshener is properly considered as a factor in the probable cause analysis"). HUERTA was coming and going at all hours, carrying heavy packages, in and out of an apartment that no one appeared to live in. There was a substantial basis to find the first element of the probable cause inquiry, "commission."

### a.       Nexus for the Quarry Street Apartment.

As described above, 290 Quarry Street (and its garage) were the focus of intense DEA scrutiny. Agents saw HUERTA and unidentified others come and go at all hours, bringing and taking away heavy packages, and using a variety of cars (at least two of which had hides in them, one with drugs and one with air fresheners). Although HUERTA had leased the property (under a false name), and was often seen there, agents did not believe he was living there. Quarry St. Aff. ¶13. He usually slept elsewhere (as did his cars). Id. On July 7, one of those cars, the blue Saab, was parked in the Quarry Street lot with cocaine hidden in a hide. Quarry St. Aff. ¶29.

When HUERTA was arrested, he provided a (new) false name, "Hector Colon," and claimed that his connection to 290 Quarry Street was that "a friend" lived there. Quarry St. Aff. ¶28. He was unable to provide the friend's full name, and claimed that the nameless friend lived in apartment 704, next door to the apartment agents knew he had rented. Id. HUERTA described his keys to an interviewing agent, not mentioning that any of them were keys to Quarry Street. Id. In fact, one key on his keychain opened the main door, while another opened

the door to apartment 705 (not 704).[15]  Id. ¶30.  All of these facts indicate an effort to hide a

relationship to the Quarry Street Apartment.

In addition to alerting on HUERTA's blue Saab, a trained narcotics dog also alerted at

the door to the garage assigned to HUERTA, id. ¶31, further strengthening the connection

between HUERTA's property and drugs.

Judge Swartwood was also entitled to rely on TFA O'Neil's training and experience, in

combination with the officer's other observations, in his review of the affidavit for sufficiency.

Ribeiro, 397 F.3d at 50-51 (although affiant's experience may not, alone, be sufficient to meet

nexus requirement, when combined with observations about movements to and from residence in

connection with drug activity, observations contribute to probable cause findings).  TFA O'Neil

was familiar with "stash houses" based on his training and experience, and knew that it was a

common practice for drug-dealers to maintain such a stash location.  Quarry St. Aff. ¶32.  He has

searched "stash houses" in the past, finding drugs, drug ledgers, presses (used to compress drugs

into wholesale-quantity blocks), agents to "mix" or "cut" the drugs, scales, money, and personal

property identifying the owner(s) of the property and others who used it.  Quarry St. Aff. ¶33.

These facts, taken as a whole, are adequate to support a "nexus" between the Quarry

Street Apartment and the drug-dealing offense.

**b.      Nexus for 6123 Avalon Drive.**

After receiving and executing the search warrant at the Quarry Street Apartment, TFA

---

[15] Agents entered this apartment before the search warrant issued, but saw nothing of note
and included no observations from this entry in the warrant application.  Quarry St. Aff. ¶30.
This entry is therefore of no legal significance.

O'Neil sought judicial authorization to search BRITO's home at 6123 Avalon Drive.[16]  The

Avalon Affidavit was informed by the results of the Quarry Street Apartment warrant, in which

agents had discovered, among other things, seven kilograms of cocaine, approximately $50,000,

and a loaded 9-mm handgun.  Avalon Aff. ¶9.  Agents had also learned of a third concealed

compartment in a third car used by HUERTA and BRITO: a hide was found under the back seat

of the white Volvo station wagon located inside the 290 Quarry Street garage.  Avalon Aff. ¶9.

Like the hide found months earlier in the black Infiniti, it was empty save some air fresheners.

Id.

The scale of the organization was now more obvious: three cars with hides in them, seven

kilograms of cocaine, a loaded gun, and $50,000 seized.  Conversations described in the affidavit

added to the evidence, including calls in which BRITO encouraged Rivera to collect "that

money," later described as "18 pesos," then "20."  Avalon Aff. ¶¶14, 16.  Given the quantities of

drugs and money involved, this could fairly be read as meaning $18,000-20,000.  It was also fair,

then, to infer that BRITO would "accumulate[] a substantial amount of cash that he would have

to keep in a 'safe yet accessible place.'  Feliz, 182 F.3d at 87-88.  It was reasonable to infer that

[the defendant] would use his apartment for such needs."  Ribeiro, 397 F.3d at 50.  And, again,

Judge Swartwood was entitled to rely on TFA O'Neil's relevant experience, which was again laid

out in the affidavit.  See Ribeiro, 397 F.3d at 50-51.

BRITO attempts to distinguish himself from the defendant in Feliz, whom he

characterizes as a "regular, large-scale trafficker," of the type who would ordinarily be expected

---

[16] The same application and affidavit sought permission to search HUERTA's suspected
home, at 42 Whitfield Street, #20, Dorchester, Mass.  No suppression motion has been filed with
respect to that search.

to "keep detailed accounts, customer lists, and money 'in some safe yet accessible place,' i.e, their homes."  Supp. Mem. 2 (quoting Feliz, 182 F,3d at 87-88).  The "large-scale" trafficking in Feliz was a single kilogram of cocaine, cf. Feliz, 182 F.3d at 85, compared to seven kilograms here.

It is true that BRITO was not observed driving to and from his residence in connection with drug deals.  That fact is not dispositive, as Feliz and its progeny make clear.  What was required for the warrant to issue was a collection of facts that, taken together, "warrant a person of reasonable caution to believe that the evidence of a crime will be found."  Feliz, 182 F.3d at 86.

BRITO and HUERTA were engaged in cocaine dealing.  The recorded calls, combined with agents' surveillance, revealed that HUERTA was the hands-on person: he was in control of the stash house, he moved the bags in and out, he was most often seen driving and switching cars.  HUERTA was dispatched by BRITO to collect money, and BRITO told HUERTA to put the money away for him.  Avalon Aff. ¶18.  Unsurprisingly, BRITO largely steered clear of the stash location.  The place was in HUERTA's name.  HUERTA was not entirely excluded from BRITO's apartment, however; when BRITO first applied for the lease, HUERTA was offered up for credit purposes.  Avalon Aff. ¶22.

In Feliz, 182 F.3d at 86, the court upheld the search of an alleged drug dealer's house even though, like here, there was no direct evidence of a nexus between the drug crimes and the house.  See 182 F.3d at 86.  The court held that it is reasonable to infer that a regular drug trafficker possessed documents relating to his business at his sole place of residence.  See id. Other circuits have reached the same conclusion.  See, e.g., United States v. Thomas, 989 F.2d

1252, 1255 (D.C. Cir. 1993) (observations of drug trafficking occurring away from suspect's residence can provide probable cause for search of house); United States v. Williams, 974 F.2d 480, 482 (4th Cir. 1193) (affidavit establishing that known drug dealer currently resided in motel room held sufficient to establish probable cause that drug paraphernalia would be found in room); United States v. Cruz, 785 F.2d 399, 406 (2d Cir. 1986) (probable cause for search of drug dealer's apartment even though defendant was not seen using apartment). These cases thus compel the conclusion that the warrant was properly issued.

The seizure of records were from the Quarry Street Apartment, much bruited by BRITO, does nothing to dilute the likelihood of records *also* being found at 6123 Avalon Drive. Indeed, the Avalon Affidavit would have been stronger had it included the fact that drug records were found in the Quarry Street Apartment, a stash location controlled by HUERTA. It was reasonable to expect to find records there -- HUERTA's records, and perhaps records of sales made by the organization. It is not reasonable to assume that all of BRITO's records would also be stored at Quarry Street (as, indeed, they were not). Drug dealing is a business. A savvy drug-dealer, like any good businessman, will not rely on his associate or underling to keep his records for him. BRITO's records, showing the moneys collected for him by HUERTA, and the orders placed and outstanding for cocaine, and the outstanding customer debts, would reasonably be "in some safe yet accessible place," Feliz, 182 F.3d 87-88, such as his home.

As the Feliz court recognized, "[t]he nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]....'"

Feliz, 182 F.3d at 88, citing United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979).  So it
is here: agents did not see BRITO conducting his drug business in and out of his home.  But they
did know it was his home, and they knew he was in the drug business.  Furthermore, they knew
that he was not a dime-bag, street-corner dealer, but rather a dealer who, with his associate, had
seven kilograms of cocaine and $50,000 on hand at one time.  TFA O'Neil was an experienced
agent, knowledgeable in the habits of drug dealers.  Given all the facts laid out in the Avalon
Affidavit, Judge Swartwood's decision to issue the search warrant had a "substantial basis."  The
case may be close, but the warrant still stands: "[t]he Supreme Court made it perfectly clear that .
. . doubtful cases should be resolved in favor of the warrant."  Rosencranz v. United States, 356
F.2d 310, 316 (1st Cir. 1997).

### 3.    Officers acted in good faith in executing the warrants.

Were the Court to invalidate the warrants, the evidence seized at the Quarry Street
Apartment and 6123 Avalon Drive would nonetheless be admissible under the "good-faith
exception" articulated in United States v. Leon, 468 U.S. 897 (1984).

In Leon, the Supreme Court held that "evidence obtained in objectively reasonable
reliance on a subsequently invalidated search warrant cannot justify the substantial costs of
exclusion."  Leon, 468 U.S. at 922; see id. at 926 (suppression not appropriate remedy where
defective warrant based upon "evidence sufficient to create disagreement among thoughtful and
competent judges as to the existence of probable cause.").  Suppression in such cases does not
"'logically contribute to the deterrence of Fourth Amendment violations.'" United States v.
Capozzi, 347 F.3d 327, 332 (1st Cir. 2003), quoting Leon, 468 U.S. at 921; United States v.
Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

48

Suppression is still appropriate, however, in four situations, two of which BRITO claims are relevant here:  where the warrant is based upon an affidavit "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and where the issuing judge "was misled by information in an affidavit that the affiant knew was false, or would have known was false except for his reckless disregard for the truth."  Leon, 468 U.S. at 922-23.  The central question is whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  Leon, 468 U.S. at 923 n.23.

The first argument -- that Judge Swartwood's issuance of the warrant was based on a document essentially devoid of probable cause -- is amply addressed above and will not be repeated here.  In short, the government submits that both the Avalon Affidavit and the Quarry Street Affidavit contained ample basis from which the issuing judge could, and did, find probable cause.  The  affidavits set forth the details of surveillance observations (both visual and auditory), information about drug seizures (in the Avalon Affidavit) and other information that connected HUERTA and BRITO, and their drug-dealing, to the Quarry Street Apartment, as well as information connecting BRITO to the Avalon Drive apartment.  TFA O'Neil's affidavits were not "bare-bones," but provided specific investigative information and the officer's reasonable inferences, based upon his experience and training, from that information.  See United States v. Robinson, 359 F.3d 66, 70 (1st Cir. 2004), citing Leon, 468 U.S. at 926; see also Capozzi, 347 F.3d at 334 (noting fact that affidavit not "bare bones" in support of good faith determination); Diehl, 276 F.3d at 43 (concluding that affidavit which was not bare bones supported good faith conclusion).

BRITO's second claim is that the Avalon Affidavit improperly did not include the fact

that the search of the Quarry Street Apartment had yielded "drug ledgers/notebooks" and a "bag containing miscellaneous documents."  Supp. Mem. 7.  These omissions, BRITO claims, were material, and their omission bars application of the good-faith rule.  Id. 7-8.

To be "material," an omitted fact must affect the finding of probable cause.  See Capozzi, 247 F.3d at 332.  Here, then, the question is whether, had the Avalon Affidavit included the fact that ledgers and notebooks had been found at the Quarry Street Apartment, Judge Swartwood would necessarily concluded there was not probable cause to issue the Avalon Drive warrant.

The answer is no.  Looking at the "totality of the circumstances" in the Avalon Affidavit, the addition of the fact that ledgers and notebooks had been found at the Quarry Street Apartment would not tip the balance away from a determination that "there is a fair probability that contraband or evidence of a crime will be found" at the apartment.  Illinois v. Gates, 462 U.S. 213, 238 (1983).

As described in subsection 2, above, the fact that drug "cuff-sheets" were found at the Quarry Street Apartment *strengthens*, rather than weakens, the request to search 6123 Avalon Drive.  Having omitted potentially helpful information from a search warrant affidavit cannot be said to be a "material omission" of the type that would require finding the search was not conducted in good faith.  Compare, Capozzi, 347 F.3d at 332-33 (omission from search warrant affidavit of fact that anonymous tipster represented herself to be more reliable than affiant had personal basis to know not "material omission").  At worst, the omitted fact was a piece of ambiguous evidence: the government finds it helpful to its cause, while the defendant claims it aids him.  As such, it cannot reasonably be said to be so "material" that its inclusion or exclusion would govern the fate of the warrant.  Compare, e.g., United States v. Vigeant, 176 F.3d 565,

573-74 (1ˢᵗ Cir. 1999) (no <u>Leon</u> exception where affiant (1) did not mention CI's "long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his reliability," nor (2) that defendant had filed a CTR as required [a piece of exculpatory evidence], nor (3) fact that cashier-check deposit was made by defendant's grandmother, and (4) failed to investigate defendant's employment status, and (5) indicated that two companies were "front" companies, when no evidence supported that conclusion, and (6) misrepresented a piece of documentary evidence, making it more damning than it was, and (7) misrepresented a boat purchased by the defendant as a "pleasure boat," when it was instead a boat in bad condition, and (8) claimed that the CI had witnessed a drug transaction involving Vigeant, which the CI had not).

Should the Court find that the affidavit was not supported by a substantial basis, as required, the <u>Leon</u> exception applies and the evidence should be admitted.

### III. <u>CONCLUSION</u>

For the reasons set forth above, and any adduced at hearing or in further briefing, the government submits that the defendants' motion should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ Neil Gallagher

 Neil J. Gallagher, Jr.
Rachel E. Hershfang
Assistant U.S. Attorneys

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

/s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.