UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 05-CR-10227-PBS

UNITED STATES OF AMERICA

V.

RAFAEL HEURTA

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS**

Now comes Rafael Heurta and files this supplemental memorandum in support of his motion to suppress.

Defendant Heurta joins in the legal arguments contained in the memoranda filed by codefendant Brito-Melo. Additionally, defendant Heurta presents the following arguments.

**1.    Should the court determine that the government had developed reasonable suspicion to believe that there were drugs in the Saab, the dog sniff performed by the Massachusetts State Police K-9 did not transform the reasonable suspicion into probable cause to search for drugs.**

The defendant acknowledges that a brief detention of luggage located in a public place for purposes of exposing it to a dog sniff is not a search within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S. 696, 707 (1983).  A brief detention turns into an unreasonable and impermissible detention when the seizure approaches ninety minutes.  Id., at 710.  A dog sniff during a legitimate traffic stop does not intrude upon legitimate privacy interests.  Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834 (2005).  Accordingly,

provided the court has determined that the police reasonably suspected that the Saab contained drugs,[1] law enforcement may have been permitted to subject the Saab to a dog sniff. The defendant nevertheless contends that the canine's so-called "alert" was insufficient to establish probable cause to search the Saab.

When deciding whether the "alert" testified to in the instant case indicated the presence of cocaine in the Saab, the court should carefully consider the testimony during the suppression hearing as to what the dog handler may interpret from a canine's "alert". In particular, the court should consider that in order to justify a warrantless search a car the government bares the burden of establishing that the police had developed probable cause to believe that the vehicle contained contraband or evidence of a crime at the time of the search. Arkansas v. Sanders, 442 U.S. 753 (1979). Further, the court should consider the well reasoned analysis of the myth of canine infallibility in Justice Souter's Caballes dissent and other cited authority.

The defendant acknowledges that an alert by a drug sniffing

---

[1] The defendant maintains that the police had not developed reasonable suspicion and the search of the Taurus preceding the dog sniff of the Saab should have relieved the police of their baseless suspicions. Defendant Heurta relies on codefendant Brito-Melo's reasonable suspicion argument.

dog may contribute to a finding of probable cause. <u>United States v. Navedo-Colon</u>, 996 F.2d 1337, 1339 (1st Cir. 1993) and more recently <u>United State v. Sanchez</u>, 417 F.3d 971, 976 (8th Cir. 2005). Often, courts have found that canine "alerts" simply indicate the presence of the residual odor of drugs. <u>United States v. Rosario-Peralta</u>, 199 F.3d 552, 562 (1st Cir. 1999)(canine alerted to drugs on "clean" deck of vessel from which law enforcement claimed to have seen bales of cocaine dumped), <u>United States v. Gregory</u>, 302 F.3d 805, 811 n. 1 (2002), <u>cert. denied</u>, 538 U.S. 992 (2003) (handler testified that on occasions when no drugs were found after dog alerted, there was evidence that drugs had been in the location prior to the dog's alert) and <u>United States v. Boxley</u>, 373 F.3d 759, 761 (6th Cir.), <u>cert. denied</u>, 125 S.Ct. 435 (2004) (dog alerted to defendant's pocket, but no drugs found so alert was used to link defendant to nearby drugs).

As Justice Souter stressed in his <u>Caballes</u> dissent, "[a]t the heart of both <u>Place</u> and the Court's opinion today is the proposition that sniffs by a trained dog are *sui generis* because a reaction by the dog in going alert is a response to nothing but the presence of contraband." 125 S. Ct., at 839-840. "The infallible dog, however, is a creature of legal fiction." <u>Id</u>.

The defendant contends, based on the testimony of Massachusetts State Trooper Kane (the canine handler) that, at

best, his drug sniffing dog's "alert" merely indicated that drugs had been present in the area sniffed within six to twelve hours. The dog's alert is no different if there are drugs present or if there were drugs in the area six hours earlier.[2]

The government offered no explanation as to why Trooper Kane's canine "alerted" to the garage which the defendant rented despite the empirical evidence which demonstrated that drugs could not have been present in the garage within twelve hours of the canine's "alert".[3] The canine's "alert" to the garage is an

---

[2]    It was difficult to determine exactly how Trooper Kane's canine alerted. Often he performed a "moonwalk" sit, which he did at the Saab and the garage door. Other times he would curl his tail, wag his tail or change his breathing. A dog, trained to alert passively (as was Trooper Kane's canine) is supposed to have a specific final response. See United States v. Johnson, 323 F.3d 566, 567 (7th Cir. 2003) and United States v. Heir, 107 F.Supp 1088 (D.Neb. 2000); also see J.G. Aristotelidis, Trained Canines at the U.S.-Mexico Border Region: A Review of Current Fifth Circuit Law and a call for Change, 5 Scholar 227, 230-31 (2003).

[3]    Special Agent Tully and Trooper O'Neil both testified that early on July 7, 2005 (at 5:45 a.m.) the defendant was observed entering and exiting the garage with a gym bag. No one was seen accessing the garage after 5:45 a.m. on July 7. Nevertheless, approximately sixteen hours later, Trooper Kane's canine "alerted" to the presence of drugs in the garage. The garage subsequently was searched pursuant to a warrant and no drugs were found.

example of Trooper Kane's canine's lack of reliability.[4]  It also conflicts with the myth of the infallible canine on which the government supports the search of the Saab.

Further evidence of what little a canine's "alert" means with respect to whether there are drugs present when and where the dog "alerts" was provided when the government offered testimony concerning the May 18, 2005 dog sniff of the Black Infiniti driven by Malvin O. Velasquez.  <u>Also see</u>, Government Exhibit 15, pp. 8-9 (the affidavit in support of the application to search the garage).  On May 18, 2005, agents involved in this investigation seized a Black Infiniti driven by Mr. Velasquez. the motor vehicle was searched.  During the search, which resulted in the discovery of no drugs, the agents had Massachusetts State Police Trooper Fallon utilize his drug sniffing dog.  The canine "alerted" to the area of the front console and the backseat.  Though there was a "hide" with air fresheners in the front console, there were no drugs in the "hide".  There were no drugs in the backseat.  This is simply another example of a drug sniffing dog "alerting" to an area

---

[4]  Even though the government claimed that Trooper Kane's canine reacted to the garage without any opportunity for Trooper Kane to cue the dog, a false alert can result from a handler's conscious or unconscious signal that leads a dog to where the handler suspects contraband items to be located.  <u>United States v. Outlaw</u>, 134 F.Supp 807, 813 (W.D. Tex. 2001), <u>aff'd</u> 319 F.3d 701 (5th Cir. 2003),

where no drugs were present.

The agents involved in the instant investigation were aware that Trooper Kane's canine's alert only meant that drugs probably were present within the past twelve hours in a location to which the canine "alerted". Accordingly, the canine's "alert" to the rear of the Saab did not transform what may have been a reasonable suspicion that the defendant had placed drugs into the Saab into probable cause that there were drugs in the Saab. Unless the court determines that the police obtained a valid and voluntary consent to search the Saab, the search of the Saab must be suppressed as one which was not based on probable cause that there was contraband or evidence of a crime in the Saab at the time of the search.

**2.    The "Consent" to search the Saab was not voluntary.**

The Fourth Amendment's probable cause and warrant requirements do not apply where an authorized party voluntarily consents to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, consent given during an illegal detention is presumptively invalid, United States v. Cellitti, 387 F.3d 618, 622-23 (7th Cir.2004), and any evidence discovered in a subsequent search is inadmissable unless the taint of the illegal conduct is somehow dissipated. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407 (1963).

While "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, custody alone has never been enough in itself to demonstrate ... coerced ... consent to search." United States v. Trueber, 238 F.3d 79, 85 (1st Cir. 2001) quoting United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000) (internal quotations and citations omitted) (omissions in original). The question of voluntariness is a question of fact determined by the totality of the circumstances. Id. Voluntariness turns on a number of factors, including the length of time the person is detained, the person's age, education, experience, intelligence, and knowledge of the right to withhold consent. United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) and Cellitti, at 622-23. If the consent to search results from an independent act of free will, United States v. Pedroza, 269 F.3d 821, 827 (7th Cir.2001), or is sufficiently attenuated from the illegal police activity, United States v. Jerez, 108 F.3d 684, 694-95 (7th Cir.1997), the taint is "purged" and the consent is valid.

When analyzing whether consent is valid despite unlawful police conduct, courts consider (1) the time elapsed between the illegal conduct and the discovery of the evidence; (2) the existence of intervening circumstances; and (3) the nature of

7

the official misconduct.  Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254 (1975); United States v. Johnson, 427 F.3rd 1053 (7th Cir. 2005).

A "seizure" occurs when a reasonable person would not feel free to decline the officers' request or otherwise terminate the encounter.  See United States v. Drayton, 536 U.S. 194, 202, 122 S.Ct. 2105 (2002).  Police conduct which essentially prolongs detention so that a suspect will consent to a search is no less egregious than an unlawful detention.  United States v. Ford, 333 F.3d 839, 843 (7th Cir.2003).

In the instant case, the seizure of the defendant was ongoing when he signed the consent form, foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint.  See Jerez, 108 F.3d at 695.  In that this case presents none of the recognized exceptions to the exclusionary rule, see, e.g., United States v. Leon, 468 U.S. 897, 927 (1984)(good faith); Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501(1984)(inevitable discovery), the drugs discovered in the Saab should not be admitted into evidence.  See Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437 (1960)); United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir.2003).

Having been placed in a locked cruiser, driven by the police from the highway to the parking lot which was populated

by approximately fourteen law enforcement officers, the defendant's encounter with the police progressed beyond an investigatory detention. It developed into an arrest long before he signed the consent form to search the Saab. See Dunaway v. New York, 442 U.S. 200, 212-13, 99 S.Ct. 2248 (1979).

While the government may dispute that the defendant was arrested or even detained, it cannot reasonable contend that he was ever free to leave. If the government demonstrates even a modicum of reasonableness, it will concede that Trooper Kane's contention that the defendants were always free to leave the stop on Route 93 was inaccurate. Because the initial detention of the defendant was extended so that it lasted at least two hours before he signed a consent to search form, the Court should find that the consent form was signed while the defendant was under arrest and without the benefit of any Miranda warnings. See United States v. Place, 462 U.S. 696, 710 (1983) (a reasonable Terry stop turns into an effective arrest when the seizure approaches ninety minutes).

Provided that the initial stop of the Taurus was legal,[5] a subsequent arrest of the defendant may have been legal, given that the police reasonably believed that he was the person he claimed to be with the support of a New Hampshire license. The defendant nevertheless was effectively under arrest when he was transported from Route 93 to Quarry Street and entitled to a valid <u>Miranda</u> warning before being questioned.[6] Thus, it is not likely that the defendant's signing of the consent form was voluntary. Rather, consistent with the defendant's testimony, he signed the consent form because he was told to by Trooper Cepero.

The best time line which the court can draw from the police

---

[5] See footnote 1. Additionally, the Court should reject any contention by the government that the police were authorized to stop the Taurus for a violation of M.G.L. c. 89, § 4A. There was no evidence presented that the movement from the right travel lane into a tire's width of the breakdown lane was not preceded by the driver first ascertaining if such movement could be made with safety. There were no cars parked in the breakdown lane in front of the Taurus. There were no cars coming up from behind the Taurus in the breakdown lane.

It is not unilaterally unsafe to briefly move into the breakdown lane. In fact, on some portions of the highways in Massachusetts, cars are permitted and encouraged to operate in the breakdown lane during rush hours.

[6] The disputed <u>Miranda</u> warning allegedly given to the defendants in English by Trooper Duane was not valid, given the collective knowledge of the police that the defendants did not understand English very well. The defendants' inability to communicate extensively in English prompted the police to call Trooper Cepero.

testimony, some of which was contradictory, is that the defendants were stopped on Route 93 at about 9:40 p.m.  The consent form was signed by Heurta more than two hours later, around 11:45 p.m.

The defendant could not have signed the consent form any earlier because all of the evidence indicated that he singed the form after being interviewed by Trooper Cepero and asked by Trooper Cepero and Trooper O'Neil about the keys seized from the White Taurus.

Trooper Cepero received a call to assist in the interview process while he was working a paid detail in Canton.  He received the call at 11:15 p.m.  He drove from Canton to Quincy and began the interview process at 11:30 p.m.  That is the time he wrote at the top of his interview notes.  The initial interview of the defendant and the subsequent discussion with the defendant which involved Trooper O'Neil and the keys took about ten to fifteen minutes.  Thus, the earliest the defendant could have signed the consent form was 11:45 p.m.

Trooper Cepero's recall of the time he was first contacted and how long the process took should be considered far more reliable than the other witnesses' recall.  Most importantly, Trooper Cepero took special note of the time because he was on a paid detail and had to keep track of when he was gone from that detail.  Trooper Cepero had no incentive to misstate the times.

The other witnesses had an incentive to convince the court that the defendant signed the consent form as close in time to the initial stop as possible. They wanted to bolster their contention that the defendant was not in custody and the request for consent occurred during a relatively short <u>Terry</u> stop.

Trooper Kane made a tortured attempt to convince the Court that he had personal knowledge that the defendants were at the State Police barracks by 11:43 p.m., the computer generated time on the State Police booking sheets for both defendants' (Exhibits 26 and 29). That story fell apart when he claimed that the print time on the upper right hand corners of the booking sheets coincided with his memory that booking process took about two hours, after which he printed the booking sheets. Evidently he didn't look closely at the booking sheets before testifying that they supported his memory of the booking process. The print time on the upper right hand corners of the booking sheets reads 1:43 **PM**. Thus, the booking sheets were printed on some date at 1:43 in the afternoon, not during the early morning hours of July 8, 2005. Ultimately, even Trooper Kane had to admit that he had no personal knowledge concerning

the entry of times on the booking sheets.[7]

Consent was obtained while the defendant was under arrest. The defendant had not been advised of his Miranda rights. He had been held in harsh circumstances for two hours.[8] The police were purposely denying the defendant his Miranda rights because they knew that they needed his consent in order to search the Saab. They knew that consent was required because they had not developed probable cause to search the Saab.

---

[7] Similarly, the court should reject Trooper Kane ability to recall that the drugs were seized from the Saab at 11:00 p.m., and thus the defendant must have signed the consent to search prior to 11:00 p.m.

Unless the police searched the Saab prior to having Trooper Cepero obtain the defendant's signature on the consent to search form **-- they wouldn't do that!! --** Trooper Kane's notation on the Narcotic Custody Form (Exhibit 25), that the time of incident was 23:00 (11:00 p.m.), did not indicate that the drugs were seized from the Saab at 11:00 p.m. Trooper Cepero wasn't called to assist until 11:15 p.m. He didn't arrive at Quarry Street until 11:30 p.m. He didn't obtain the defendant's signature until 11:45 p.m.

[8] The police testimony suggested that the defendant signed the consent form within approximately thirty minutes after being transported from Route 93 to Quarry Street. Thus, he was kept on Route 93 for approximately ninety minutes. According to all the witnesses, most of the time the defendant was on Route 93 he was not in a vehicle, but standing in the break down lane while being detained by law enforcement officers. The defendant claimed that he was told to keep his hands on his head for most of the time.

**Conclusion:**

For the reasons stated in codefendant Brito-Melo's motion to suppress and supporting memoranda and for the reasons argued in the defendant's motion to join Brito-Melo's motion to suppress and in this memorandum, the court should allow the defendants' motion to suppress the drugs discovered in the Saab, excise reference to that seizure from the affidavit in support of the application to search the Quarry Street apartment and allow the motion to suppress the search of the Quarry Street apartment.

**Respectfully Submitted,**
**RAFAEL HEURTA,**

**By his attorney:**

_____
**J. THOMAS KERNER**
**MA BBO # 552373**
**Attorney at Law**
**230 Commercial Street**
**Boston, MA  02109**
**(617) 720-5509**