IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   :
             :   CRIMINAL ACTION
  v.           :   NO. 05-10227-PBS
             :
WILGEN ANIBAL BRITO-MELO et al. :
             :

## UNITED STATES' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

_____The United States respectfully submits that defendant's motion to suppress evidence should be denied.. First, BRITO cannot challenge the search of the blue Saab or Apartment #705 because he does not have standing.  Second, the statements which both defendants gave to Trooper Cepero are admissible because they were not the product of "custodial interrogation." Even if they were in custody, Trooper Duane advised each defendant of their *Miranda* warnings before the interview by Trooper Cepero.  Third, after the initial car stop, the continued investigatory detention of defendants was justified by additional facts learned during the stop, including HUERTA's use of a fraudulent driver's license, the positive dog alert to the blue Saab and Garage #9, and the false and contradictory statements both BRITO and HUERTA gave to Trooper Cepero.  Fourth, HUERTA gave valid written consent to search the Saab.  Moreover, the consent was voluntary even if HUERTA was in custody at the time.

## FACTS INTRODUCED AT SUPPRESSION HEARING

A.  <u>DEA Starts Investigating Brito and Huerta; Attempted Controlled Delivery of Sixty Kilograms of Cocaine in New York City.</u>

Beginning in January, 2005, the Boston office of the Drug Enforcement Administration

("DEA")'s New England Field Division investigated Wilgen Anibal Brito-Melo ("BRITO") and

Rafael Huerta ("HUERTA").  A cooperating source ("CS-2")[1] in a DEA investigation in New

York indicated that BRITO was a large-scale cocaine trafficker.  6/6 Tr. 10.[2]  BRITO was the

Boston operative for a large-scale cocaine trafficking organization based in the Dominican

Republic.  6/6 Tr. 11-12.  DEA-New York had identified "Oregano" (Yubel Mendez), BRITO's

common-law brother-in-law, as the Dominican head of this organization.  6/6 Tr. 11.  "Buchito"

was the New York operative for Oregano.  6/6 Tr.11.

Investigation bore out what CS-2 said:  CS-2 placed a recorded "dirty call" to BRITO in

December, 2004, in which the two discussed, in coded terms, a 60-kilogram cocaine seizure by

DEA-New York in November, 2004.  Ex. 5 (O'Neil Aff.) 32-33.  New York agents had

intercepted sixty kilograms of cocaine en route from the Dominican Republic to New York.  6/6

Tr. 17-18.  The agents attempted a controlled delivery of the narcotics through a series of

negotiations with Buchito.  6/6 Tr. 9-10.  Analysis of Buchito's telephone records indicated that

after each conversation with the DEA agents, his phone was in contact with BRITO's phone, a

cellular telephone responding to (617) 590-5820 (the "target telephone").[3]  6/6 Tr. 10.  Cell site

---

[1]During testimony, DEA Special Agent Mark Tully and DEA Task Force Agent Trooper Kevin O'Neil referred to this person as "CS-2," to be consistent with prior filings.  The nomenclature will be retained here.

[2]Citations to hearing transcripts will take the form "day/month Tr. [page number]."

[3]The target telephone was registered to Pacific Beepers, a company run by suspected drug dealer Jorge Peguero, whose name had previously come up in a separate DEA investigation involving an undercover purchase of cocaine. 6/6 Tr. 70.  BRITO used the phone. 6/6 Tr.16, 70. On December 16, 2004, New York DEA agents instructed CS-2 to call the target telephone and, during this recorded conversation, CS-2 identified the user's voice as that of BRITO.  Ex. 5 (O'Neil Aff.) 32.  Furthermore, BRITO used the target telephone as his phone number when he rented a Dodge Durango from Enterprise Rent-a-Car in Revere, Massachusetts under the

records showed that the target telephone was in New York at the time of the attempted 60-kilogram delivery. O'Neil Aff. 24-27. The timing of these calls, and BRITO's presence in New York, suggest that Buchito was seeking advice from BRITO and conferring with him about the sixty kilogram delivery. 6/6 Tr. 12. In a later call intercepted on the wire, BRITO consulted with Oregano regarding the sixty kilogram shipment lost by Buchito. Id. at 43-44.

B.     DEA Wiretap Investigation of the Target Telephone.

DEA was authorized to intercept calls over the target telephone on March 25, 2005. 6/6 Tr. 14, 86. The wiretap ran until May 19, 2005, when BRITO discarded or passed off the phone. Id. at 18, 61. In many of the calls, BRITO and HUERTA conducted drug business using coded language (e.g., "tickets" or "pesos" to represent money and "cars" or "girls" to denote drugs). Id. at 24. See, e.g., 6/6 Tr. 29-31 (call between BRITO and "Angel" about a "car"); 6/6 Tr. 36-38, 40, 57-58 (series of calls between BRITO and HUERTA to set terms of drug deal with customer "Paisa").

As described in some detail in TFA O'Neil's affidavit in support of the application for continued interception of the target telephone (sealed Ex. 20), those conversations include discussions between BRITO and suspected local customers of his. See, e.g., Ex. 20 at 16-17 (conversations with "Julian" in which Julian describes to BRITO his efforts to collect "some papers" [money] for BRITO); Ex. 20 at 21 (calls with Julian in which Julian says he has money to give to BRITO and the two agree to meet). They also include conversations between BRITO and suspected suppliers. In one set of calls with a man named "Angel" in the Dominican

---

pseudonym of Jose Navarro Concepcion. 6/6 Tr. 94. Agents saw BRITO using this car. Id. at 110.

Republic, BRITO and Angel discussed the loss of 60 kilograms to a DEA operation in New York. Ex. 20 at 24-28; 6/6 Tr. 29-31. During those conversations, BRITO is believed to have ordered 63 kilograms of cocaine, for which he had already paid $95,000 in up-front costs. Ex. 20 at 28. In another set of calls with "Wilkin," BRITO and Wilkin talked about "Coqui," believed to be one of BRITO's cocaine suppliers. BRITO told Wilkin that Coqui got "the cars" delivered to his dealership in New York, and that "if those cars come out cheap, they can even be sold right there" -- in other words, that Coqui was always importing cocaine from Santo Domingo, and that it could be sold right in New York. Ex. 20 at 36-37. Wilkin then went on to say that he had had "400" the other day, again referring to "cars." Ex. 20 at 37.

The intercepted calls also evidenced BRITO's fear of speaking openly on the telephone. For example, in calls on March 26 and 27, 2005, BRITO spoke with a man in New York whom he called "Rafaelito." To agents reviewing the tapped calls, BRITO and Rafaelito were arranging a trip by BRITO to New York, in which BRITO would deliver money or drugs to Rafaelito. Ex. 20 at 13. In those calls, BRITO first puzzles with Rafaelito as to how they can "do 'it'," because BRITO doesn't want to talk with Rafaelito over the telephone. Id. In calls the next day, BRITO confirmed that he was in New York, and the two agreed to meet and speak in person. Id. at 14. (During this same trip to New York, according to intercepted calls, BRITO met with Oregano. See Ex. 20 at 25.) BRITO's conversations with Julian also exhibit this caution about talking on the phone; in a call on March 25, summarized in Exhibit 20, Julian told BRITO that he wanted to give "the guy" "the loose kind," but insisted on discussing the deal in person. Ex. 20 at 11-12. Julian was presumably telling BRITO that he had a customer for loose (powder) cocaine, but that the two should discuss this important business in person, rather than over the phone. Ex. 20 at

4

12.  See also Ex. 20 at 35 (in conversation with "Caballo," BRITO refuses to talk over the phone

or the radio, and insists on meeting in person).

BRITO's and HUERTA's surveillance-consciousness was also evident to agents from the

calls intercepted on the wiretap.  For example, on March 25, HUERTA warned BRITO that there

were "a lot of lights in the area" -- i.e., that there was a strong police presence, so he should

beware.  Ex. 20 at 21.  In mid-April, HUERTA talked with BRITO about DEA's recent arrests of

approximately eight defendants by DEA, two of whom HUERTA identified by name.  Ex. 20 at

21-22.  (DEA agents working on this investigation were familiar with the targets and knew of

their arrests.  Id.)  Julian also initiated a discussion of these arrests with BRITO, but BRITO

asked to continue the conversation in person.  Id. at 22.

C.    Identification of 290 Quarry Street as a Stash Location.

Beginning on April 23, 2005, during a series of intercepted calls, agents learned the

details of a money pick-up orchestrated by BRITO.  6/6 Tr. 40-41; see also Ex. 2.  First, BRITO

instructed "Pinto" (HUERTA) to head to the Mobil gas station "right there" to meet an individual

and "get that" -- drug proceeds.  Exhibit 2, Tab 7, call 2529; 6/6 Tr. 40-41; 6/13 Tr. 8.   In later

calls with Felipe, the man with whom "Pinto" was to meet, BRITO told Felipe to look for a

"white fat guy" driving a white Taurus at the gas station.[4]  Ex. 2, Tab 7, Calls 2537, 2539; 6/6 Tr.

41.  Felipe told BRITO that he would be driving "Victor's SUV."  Ex. 2, Tab 7, Call 2539.

Felipe later called BRITO to confirm the car description and that "Pinto" was the "short fat white

guy" sitting in the station's parking lot.  Ex. 2, Tab 7, Call 2542; 6/6 Tr. 42.

_____

[4]Agents had seen HUERTA using this white Taurus before, and had also seen it both
parked at BRITO's residence and sitting in the rear parking lot of 290 Quarry Street.  6/6 Tr. 42.

5

In connection with these calls, TFA O'Neil was on surveillance at the Mobil gas station located near the Furnace Brook Rotary. 6/6 Tr. 99-101. He saw HUERTA arrive in the white Ford Taurus, enter the station's convenience store, buy several bottles of soda, and return the soda to his car. 6/6 Tr. 101. By that time, a man had arrived driving a silver RAV4 (a small Toyota SUV). 6/6 Tr. 100. The car was registered to Victor Delgado Caballero. 6/13 Tr. 6-7. HUERTA opened the passenger door of the SUV, moved a bag from the SUV to the Taurus, and briefly talked with the driver before both cars left the gas station. 6/6 Tr. 101. HUERTA drove to 290 Quarry Street and took the recently acquired bag into the apartment building. Id. Although agents were confident that they had just witnessed a money pick-up, they did not stop HUERTA or search his car; at that time, as TFA O'Neil explained, "[t]he Title III was still ongoing. It seemed that the organization at that time was collecting money that it was owed to them, and Brito-Melo was continuously attempting to get more narcotics through the phone conversations and his trips to New York. It was our impression at that time that prior to us going up [on the wire], they may have already distributed what they had, and that they were in the process of collecting the proceeds from whatever he had already distributed." 6/13 Tr. 56-57. Instead, agents chose to bide their time and continue investigating the ongoing cocaine trafficking. 6/13 Tr. 57.

Agents learned (by inspecting the lease) that HUERTA rented garage #9 and apartment 705 at 290 Quarry Street using the name Angel Rivera. Ex. 17 at 5-6. After following him back to 290 Quarry Street after the suspected money pick-up, DEA agents rented Apartment #201 in the 290 Quarry Street complex and installed a surveillance camera so as to monitor Garage #9 twenty-four hours a day. 6/6 Tr. 102. On several occasions, the camera showed HUERTA

carrying bags into and out of the garage.  6/6 Tr. 103.  A white Volvo was being stored in this

garage.  Id.

D.    Dog Hit on the Black Infiniti.

On May 17, 2005, HUERTA was seen entering 290 Quarry Street carrying two bags.  6/6

Tr. 103.  Shortly afterward, a black Infiniti arrived and the driver, later identified as a man with

the last name of Vasquez, carried a bag into 290 Quarry Street.  Id. at 103-04.   The next

morning, agents followed as Vasquez, again driving the Infiniti, dropped HUERTA off at home

(42 Whitfield Street, Dorchester).  6/13 Tr. 23.  Agents could not see whether or not HUERTA

was carrying a bag or bags as he went into his building.  Id.  The Infiniti (driven by Vasquez) was

stopped by police only after HUERTA got out of the car.  6/6 Tr. 107-08.   Using a drug

detection dog, police searched the car; the dog alerted to a motorized compartment or "hide"

stuffed with Bounty dryer sheets (a method used to mask the smell of narcotics).  Id.  The dog's

alert indicated the presence of narcotics odor.  There were no drugs in the hide at the time,  6/6

Tr. 108, so no seizure was effected.  The car was seized, as the presence of the hide (with air

fresheners) evidenced its use for narcotics trafficking.

E.    Events Leading to the July 7, 2005 Stop of the White Taurus.

During a seven-day stretch in early July, 2005, DEA agents observed a pattern of activity

which aroused their attention.  6/6 Tr. 111-19.  On July 1, 2005, the white Volvo left Garage #9

in the early morning and returned at approximately 10 p.m.  6/6 Tr. 110-11.  The following day

HUERTA entered the garage toting a black suitcase and quickly departed from the apartment

complex in the Volvo.  6/6 Tr. 111.  He did not return until July 6, 2005 at around 7 p.m.  Id.  A

review of the surveillance tape showed HUERTA entering the garage for a short time and

carrying a bag back into the apartment complex in the early morning hours.  Id. at 112.  Agents concluded that the white Volvo was being used to pick up narcotics for the organization and deliver money to New York, and that it had made such a trip over the holiday weekend.  Id. at 115-16.

Around 9:30 p.m. on July 7, 2005, HUERTA returned to 290 Quarry Street driving a blue Saab.  6/6 Tr. 119.  He removed a bag from the Saab and entered the rear of 290 Quarry Street. Id. at 120.  Shortly after, HUERTA exited the building carrying a different small bag , which he placed in the Saab;[5] he then moved a third bag from the Saab to the white Taurus.  Id.  After the driver of the Taurus, later identified as BRITO, moved into the passenger's seat, HUERTA got into the driver's seat and left the parking lot of 290 Quarry Street.  Id. at 120-21, 123.  TFA O'Neil then directed Massachusetts State Police Trooper Charles Kane of the K-9 unit to conduct a traffic stop of the white Taurus.  Id. at 121.

F.     The Stop of the white Taurus on Route 93.

After being contacted by TFA O'Neil at approximately 9:35 or 9:40 p.m., Trooper Kane got in position to intercept the white Taurus.  6/13 Tr. 80.   Trooper Kane saw the Taurus at the Furnace Brook Rotary, and came in behind the Taurus as it entered the ramp toward Route 93 South.  6/13 Tr. 81.  After following the Taurus onto Route 93 South, Trooper Kane saw the Taurus swerving into the breakdown lane on two separate occasions within a couple hundred yards, and signaled for the Taurus to pull over by turning on his flashing lights.  6/13 Tr. 82.  The violation took place at approximately 9:40 p.m., as noted on the warning issued to HUERTA.  Id

---

[5]Agent Tully described this bag as being approximately the size of a baseball.  6/6 Tr. 51. Agent O'Neil was not asked, by either party , to describe the size of the bag, but volunteered that it was "small."  6/6 Tr. 120.

at 93.

When he first approached the Taurus, Trooper Kane asked for licenses from both HUERTA and BRITO, and asked HUERTA where they were coming from. Id at 90. HUERTA stated that he was coming from Boston, which Trooper Kane knew to be false based on the information he had received from TFA O'Neil. Id. This initial conversation lasted approximately one minute, and was entirely in English; HUERTA appeared to Trooper Kane to be able to sufficiently understand and speak English. Id at 91-92. HUERTA provided a New Hampshire driver's license with the name Hector Colon, and BRITO-MELO provided a Massachusetts driver's license with the name Jose Navarro Concepcion. Id at 88.

With the driver's licenses, Trooper Kane went back to his cruiser and contacted S/A Tully, who told him that the man who had provided the Massachusetts license ("Navarro") was known by the name BRITO-MELO. 6/13 Tr. 91-92. Trooper Kane wrote "Colon" (HUERTA) a warning for veering into the breakdown lane, which he gave to HUERTA. Id at 92. The conversation with S/A Tully and the completion of the warning took approximately four or five minutes. Id. During this time, the defendants remained in the white Taurus. 6/13 Tr. 93-94.

When Trooper Kane re-approached the Taurus after writing up the warning, he requested consent from HUERTA to search the vehicle, which HUERTA gave. 6/13 Tr. 93. At Trooper Kane's request, HUERTA and BRITO got out of the car and sat, a few feet apart, on the guardrail while Trooper Kane searched the Taurus. Id at 93-94. At this time, approximately 9:45 p.m., Trooper Kane called for another State Trooper to watch HUERTA and BRITO while he conducted the search; a few minutes later, Trooper Thomas Duane and Trooper John McDonald arrived together in a cruiser. See 6/13 Tr. 94-96. Approximately five minutes after Trooper

9

Kane's initial request for assistance, Trooper Duane began running a check of the licenses provided by BRITO and HUERTA over the radio. 6/13 Tr. 17; see also Ex. 27 (turret tape). While the check was run, Trooper Duane watched HUERTA and BRITO as they sat on the guardrail, and Trooper Kane conducted a search of the car. 6/14 Tr. 9. HUERTA and BRITO were not in handcuffs at this time. Id. Trooper Kane's search of the Taurus lasted three to five minutes;[6] no drugs or firearms were found. 6/13 Tr. 95-96.

After reporting the results of his search to TFA O'Neil and S/A Tully, Trooper Kane was instructed to drive with his trained narcotics-detecting canine, "Riggs,"[7] who had been in the

---

[6]HUERTA testified that the search lasted 50 minutes to an hour. 6/14 Tr. 96. This testimony is contradicted not only by Trooper Kane's testimony, but also by the turret tape, which demonstrates that Trooper Kane left the side of the roadless than 14 minutes after Trooper Duane arrived. See Ex. 27.

[7]Riggs was issued to Trooper Kane in March of 2001, after which they completed two trainings: a four-month patrol school, resulting in certification by the Vermont State Police Academy under the auspices of the New England State Police Association Consortium ("NESPAC") for patrol, followed (in February of 2002) by a specialized course in narcotics. 6/13 Tr. 64. After approximately seven to eight weeks of narcotics training, the team was certified by the Connecticut State Police under the NESPAC narcotic guidelines. Id. Trooper Kane and Riggs have been certified annually since that time, both in patrol and in the detection of narcotics. 6/13 Tr. 65.

Riggs is a "passive" or "positive" alert dog. 6/13 Tr. 141. He indicates narcotic odor is present, initially, through a suite of behavioral changes: "tail wagging, curled up, change in breathing, nose on something." 6/13 Tr. 141-42. Sometimes, he will exhibit a "head snap" when he first perceives narcotic odor. Id. 143. When he finally identifies the source of the odor, Riggs does a "moon-walk sit," a unique, backward-wiggling motion elegantly demonstrated in court. 6/13 Tr. 144-45. The "moon-walk sit" is different from Riggs' response to a verbal "sit" command; when told to "sit," Riggs simply "puts his butt on the ground." Id. 145. Trooper Kane is unable to make Riggs do a "moon-walk sit" on command. Id. 145.

Dogs' sense of smell is up to 400 times more powerful than that of humans. 6/13 Tr. 67. Riggs, like all dogs, can detect residual or lingering odor, even if the thing that produced the odor is no longer present, or is present only in trace quantities. Id. at 67; 77. Trooper Kane has tested Riggs' ability to discern the lingering odor of narcotics up to six hours after the narcotics have been removed from the location, and Riggs has still been able to catch the scent. Id. 68. Trooper Kane has heard of dogs who have successfully been tested on alerts, in controlled situations, and

10

police cruiser, to the parking lot at 290 Quarry St.  6/13 Tr. 96.  Trooper Kane left no more than

fourteen minutes after he called for Trooper Duane's help, 6/14 Tr. 18-19 (no later than 10 p.m.).

Meanwhile, Trooper Duane remained by the side of the road with HUERTA and BRITO,

exchanging information with headquarters in his ongoing efforts to determine the identities and

criminal records (if any) of the two men.[8]  Ex. 27; 6/14 Tr. 19, 29-30 ("When he [Trooper Kane]

left, the information was still coming back or going back and forth through Station H.").  A

review of Exhibit 27, the turret tape, reveals that there were a series of requests by Trooper

Duane to headquarters for information, and that the information came in piecemeal.  See Ex. 27,

passim.  Around this time, Trooper Duane called for another police cruiser that was in the area to

come help at the scene of the stop.  6/14 Tr.10.  This request is captured on the 14-minute long

turret tape.  See Ex. 27.

G.    Investigation Continues at 290 Quarry Street.

        Trooper Kane had arrived at 290 Quarry St. approximately three to four minutes after

leaving the site of the stop, and was asked to conduct an exterior search of the blue Saab in the

---

detected odor 12 hours or "a little bit longer" after all the odor-causing substance has been
removed.  Id. 79.  Riggs has not been tested on odor-detection for longer periods, so his outer
limit of competence is not known.  In cases involving hidden compartments, or "hides," a dog
may alert to residual, trace narcotics in the compartment.  Id. 77.  Among the factors cited by
Trooper Kane as bearing on the durability of a narcotics odor after the drugs are gone are "where
the odor was stored," "the weight of the narcotic," and "environment."  Id. 77-78.
        During the year of the search in question, 2005, Riggs had no alerts in situations where
drugs were known not to be present (i.e., during training).  6/13 Tr.

        [8] HUERTA testified that he and BRITO had their hands behind the back of their necks for
the entire time they were waiting by the side of the road. 6/14 Tr. 97.  Neither of the two veteran
troopers who were at the scene,  Trooper Kane and Trooper Duane, indicated that the two
suspects were doing anything but "sitting on the guardrail" during this time.  6/13 Tr. 94 (Kane);
6/14 Tr. 8-9 (Duane).  Neither trooper was cross-examined on the point.

parking lot and the garage doors.[9]  6/13 Tr. 97, 98.  During the search, Riggs alerted to the rear of

the Saab and to the door of Garage 9.  6/13 Tr. 98-100.   Trooper Kane had not been told which

garage had been rented by HUERTA.  6/13 Tr. 100.  It was after the dog's alert that Trooper

Kane asked Trooper Duane to bring the suspects to 290 Quarry Street.  6/6 Tr. 125.

      Within minutes of Trooper Kane's departure, he contacted Trooper Duane and asked him

to transport the suspects to 290 Quarry St. in order to further the investigation at that location.

6/6 Tr. 130.  This request was made based on the activity observed earlier at 290 Quarry Street,

the false identifications provided at the traffic stop, and the alert by the dog at the rear of the

Saab.  6/6 Tr. 130.

      Trooper Duane told HUERTA and BRITO that they were wanted at 290 Quarry St.  6/14

Tr. 27.  Trooper Duane informed HUERTA and BRITO that they were not under arrest, but

advised them of their Miranda rights in English using a card he carried.  6/14 Tr. 10-12, 29.

When asked if they understood their rights, both HUERTA and BRITO responded in the

affirmative, one with a nod and the other with an audible "yes."  6/14 Tr. 11-12.  The suspects

were patted down for safety, but not handcuffed, and then got into the two police cruisers.  6/14

Tr. 12.  BRITO and HUERTA were then transported back to 290 Quarry St.  6/14 Tr. 10.  The

trip took no more than a few minutes.  See 6/14 Tr. 19 ("Quarry Street, the location is right off

the highway. It only takes a minute to get there[.]").

_____

      [9]All witnesses who were asked about the lot behind 290 Quarry Street agreed that it was a
"public" lot, and that there was no restriction on access to the lot.. See, e.g.. 6/6 Tr. 125 (O'Neil);
6/13 Tr. 98 (Kane); 6/14 Tr.39 (Cepero).  And, as noted above, the DEA agents present in the lot
on the night of July 7 were tenants of the building, having rented apartment 201 for their
surveillance.  As the court will note from Defendant's Ex. 4, it is possible for anyone to enter the
lot and drive around it, filming.

At approximately 11:00 or 11:15 p.m., Trooper Jaime Cepero of the Massachusetts State Police, a native Spanish speaker, received a request from TFA O'Neil to travel to 290 Quarry St. to assist in the investigation. 6/14 Tr. 37. TFA O'Neil indicated that he wanted Trooper Cepero to speak with HUERTA and BRITO in Spanish in order to get consent to search the Saab. 6/14 Tr. 39. At the time the request was made, Trooper Cepero was doing a detail, in uniform, on Route 95 at University Ave. 6/14 Tr.36. When Trooper Cepero arrived at 290 Quarry St. approximately five to ten minutes later, HUERTA was seated in the back of a police cruiser, and BRITO was standing next to another cruiser. 6/14 Tr. 40-41. Trooper Cepero testified that he recalled approximately two uniformed and three plaincothes officers present in the parking lot. 6/14 Tr. 62.

After a brief conversation with TFA O'Neil, Trooper Cepero approached HUERTA and the two of them walked to the front of the police cruiser to have a conversation. 6/14 Tr. 40. Trooper Cepero asked HUERTA some basic questions, including his name, date of birth, and home address, and also inquired as to what he had been doing that night. 6/14 Tr. 42-43. HUERTA stated that his name was Hector Colon, that he lived in New Hampshire, and that he had been in the process of lending a car (the Taurus) to his friend, who he indicated was named Navarro Concepcion. 6/14 Tr. 44, 66. Although HUERTA was outwardly calm, Trooper Cepero noticed that HUERTA was pausing before answering these simple questions. 6/14 Tr.43. Trooper Cepero asked about the blue Saab in the parking lot, and HUERTA stated that, like the Taurus, the Saab belonged to his girlfriend, Deborah Miranda. 6/14 Tr.45. When asked to explain how he had brought two different cars down to Boston from New Hampshire, HUERTA stated that he had brought the Saab down earlier, and the Taurus later. 6/14 Tr.45. HUERTA

13

had two different explanations for parking the Saab in the 290 Quarry St. parking lot: first, he

said he had a friend who lived in the building; second, he claimed to know someone who worked

there and allowed him to park in the lot.  6/14 Tr.46.  HUERTA indicated that his friend lived in

apartment 704, but could not remember his friend's full name.  6/14 Tr. 46.  Trooper Cepero

found these answers inconsistent, and believed that HUERTA was not being truthful with him.

6/14 Tr. 67.

TFA O'Neil approached HUERTA and Trooper Cepero during the course of the

conversation, and asked HUERTA to identify the keys on a key chain that had been found in the

Taurus during the earlier search.  6/14 Tr. 46.  HUERTA identified several of the keys, including

the key to the Saab, but did not identify the keys to the apartment he had rented at 290 Quarry St.

6/14 Tr. 46-47.  After TFA O'Neil had walked away, Trooper Cepero asked HUERTA if he

would consent to a search of the Saab, and explained what a search entailed.  6/14 Tr. 47.  At that

time, HUERTA gave verbal consent.  6/14 Tr. 47.  Trooper Cepero then walked over to TFA

O'Neil, leaving HUERTA alone by the car, to tell TFA O'Neil about the consent.  6/14 Tr. 47-

48.  TFA O'Neil gave Trooper Cepero a written consent form in Spanish for HUERTA to sign.

6/14 Tr. 48.   Trooper Cepero filled out the information about the car on the form, and although

HUERTA indicated that he could read Spanish, and was allowed to read the form, Trooper

Cepero also read the form aloud in Spanish.  6/14 Tr. 49.  The form stated in Spanish, "It has

been asked for you to permit agents, special agents of the Department of Narcotics Drug

Enforcement Administration to search the following:" -- below which, Trooper Cepero filled in

"Blue Saab 58XP05" -- and then continued, "I have not been forced or threatened in any form.  I

give consent to search voluntarily."  6/14 Tr. 49.  The date was filled in below, and HUERTA

signed the form on the signature line (as "Hector Colon"). 6/14 Tr. 49.

The entire conversation between Trooper Cepero and HUERTA lasted approximately five to six minutes. 6/14 Tr. 50. HUERTA's demeanor was "calm, but somewhat guarded" during the interview, 6/14 Tr. 42, which was "conversational" in tone. 6/14 Tr. 50. At no point during the conversation was HUERTA handcuffed or physically restrained in any way. 6/14 Tr. 51. Other than the time when TFA O'Neil came over for a description of the keys, HUERTA was alone with Trooper Cepero for the whole conversation. 6/14 Tr. 51 Although Trooper Cepero was in uniform, he did not display his weapon or his handcuffs at any time. 6/14 Tr. 50-51.

After the consent form had been signed, TFA O'Neil and S/A Tully began a search of the Saab. 6/6 Tr. 134. During this time, Trooper Cepero spoke with BRITO, who was leaning against another police cruiser. 6/14 Tr. 51. After falsely stating that his name was Jose Concepcion, BRITO offered an explanation for his activities that evening that was inconsistent with the explanation that HUERTA had provided a few minutes earlier. 6/14 Tr. 52-3. BRITO stated that he and HUERTA were meeting to go to Brockton to fix a boiler. 6/14 Tr. 52. HUERTA had said nothing about fixing a boiler. 6/14 Tr. 41-51. BRITO also claimed that he had never been to the parking lot at 290 Quarry St. and knew nothing about the lot or any of the vehicles in it. 6/14 Tr. 54.

H.    Cocaine is Found in the Saab.

In the Saab, agents found a hidden compartment in the trunk area containing approximately one ounce of cocaine wrapped in tinfoil and a plastic bag. 6/6 Tr. 134. The hidden compartment also contained three sets of identification, including Puerto Rican birth certificates and social security cards. 6/6 Tr.135. One of these birth certificates was in the name

15

"Angel Rivera," the name Huerta used for his Massachusetts identification.  6/6 Tr. 135; Ex. 10; 6/14 Tr. 90, 107, 112.  The agents were aware that HUERTA had used this name to lease the apartment and garage at 290 Quarry Street.  Ex. 17 at 5-6.  Trooper Cepero ended his conversation with BRITO after drugs were found in the Saab.  6/14 Tr. 54.  He walked away from BRITO, leaving him alone.  6/14 Tr. 55.

After the cocaine was found, HUERTA was placed under arrest by one of the uniformed officers at the scene, and advised of his <u>Miranda</u> rights in Spanish by Trooper Cepero.  6/14 Tr. 55.  HUERTA indicated that he understood his rights, but that he wanted to continue to speak with Trooper Cepero.  6/14 Tr. 55-6.  HUERTA subsequently stated that the Saab was not his and that he was unaware of the drugs in the car.  6/14 Tr. 56.   Trooper Cepero asked how long HUERTA had been in the United States, to which HUERTA responded that he had been in the United States for eight months.  6/14 Tr. 56.   HUERTA also falsely stated that he was from Puerto Rico.  6/14 Tr. 57.   Trooper Cepero then informed TFA O'Neil that he needed to return to the detail on Route 95, and departed shortly thereafter.  6/14 Tr. 57.  Trooper Cepero's total time at the parking lot at 290 Quarry St. was approximately ten to fifteen minutes.  6/14 Tr. 57.[10]

When HUERTA was placed under arrest, BRITO was also arrested for an outstanding deportation warrant and advised of his <u>Miranda</u> rights.  Def. Ex. 5.[11]   Trooper Kane then

---

[10] At the top of Trooper Cepero's notes from that night, he wrote, "11:30."  6/14 Tr. 77. Trooper Cepero testified was not sure whether 11:30 was the time that the conversations with HUERTA and BRITO began, or the time they ended; because the marking for that number was darker than the rest of the writing on the page, he was not confident whether he had gone back to make the notation after leaving 290 Quarry Street.  <u>See</u> 6/14 Tr. 84.

[11] There is conflicting testimony as to whether BRITO was advised of his Miranda rights by Trooper Cepero at 290 Quarry St.  However, because BRITO made no additional statements, the issue has no legal relevance.

contacted the South Boston State Police barracks to inform the desk officer that he (Trooper

Kane) would be coming in with two arrests from a DEA investigation, and that there was an

identity issue that would be resolved when they arrived.  6/13 Tr. 138.  HUERTA and BRITO

were then transported approximately eight to ten miles to the police barracks for booking.  6/13

Tr.103.  The booking process for both defendants began at 11:43 p.m.  6/13 Tr. 103-04, 136; Ex.

26, 29.  The time stamp on the booking sheets was automatically generated when the incident

was initially entered into the booking system by the desk officer.  6/13 Tr. 135-36.  This began

when Trooper Kane arrived with defendants at the barracks and provided the desk officer with

copies of the licenses HUERTA and BRITO had provided by the roadside.  6/13 Tr. 103, 136-38.

HUERTA and BRITO were then booked with the assistance of a Spanish-speaking Boston police

officer.  6/13 Tr. 139.

## II.  ARGUMENT

### A.    BRITO Has Failed to Demonstrate a Reasonable Expectation of Privacy ("Standing") in either the Blue Saab or Apartment #705 at 290 Quarry Street in Quincy.

Demonstrating a reasonable expectation of privacy under the Fourth Amendment is a

threshold requirement that a defendant must establish before a court can proceed with any Fourth

Amendment analysis. United States v. Cruz Jiménez, 894 F.2d 1, 5 (1st Cir. 1990); Rakas v.

Illinois, 439 U.S. 128, 140-50 (1978).  Thus far, BRITO has not offered any evidence to pass this

threshold.  BRITO has utterly failed to offer any evidence of any reasonable expectation of

privacy in the blue Saab where an ounce of cocaine was found or Apartment #705 at 290 Quarry

Street in Quincy, where the DEA seized seven kilograms of cocaine, a loaded firearm, and

$50,000 in cash.  A defendant who fails to demonstrate a sufficiently close connection to the

17

relevant places or objects will not have standing to claim that they were illegally searched or seized. United States v. Sánchez, 943 F.2d 110, 113 (1st Cir.1991); United States v. Gomez, 770 F.2d 251, 253 (1st Cir.1985)(This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing).

Instead, the only search for which BRITO may have demonstrated an expectation of privacy is in the apartment he rented under the name Jose Navarro at 6123 Avalon Drive in Weymouth where agents seized a series of drugs ledgers. Furthermore, while BRITO was a passenger in the white Taurus at the time of the traffic stop, and arguably may have standing to contest the search of the Taurus, see United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000)(passenger in taxi cab has standing to contest search); but compare United States v. Lochan, 674 F.2d 960, 965 (1st Cir.1982)(no legitimate expectation of privacy on the part of the driver of a car whose owner was a passenger), no evidence was seized from Taurus. The only evidence that was obtained from the car stop was the fact that BRITO identified himself as Jose Navarro-Concepcion, see Govt Exhibit No. 17, pg 13, ¶ 26 (290 Quarry Street Search Warrant Affidavit of TFA O'Neil), a fact that was known to law enforcement before, and independent of, the car stop. See Murray v. United States, 487 U.S. 533, 537 (1988); Nix v. Williams, 467 U.S. 431, 443 (1984); Wong Sun v. United States, 371 U.S. 471, 487 (1963)(independent source doctrine).

Therefore, since BRITO has failed to demonstrate any type of reasonable expectation of privacy in the blue Saab and Apartment #705 at 290 Quarry Street, BRITO is precluded from challenging the search of these locations under the Fourth Amendment.

**B.**    **At The Time Both BRITO and HUERTA Gave Voluntary Statements to Trooper Cepero at 290 Quarry Street, Defendants Were** <u>Not</u> **"In Custody" for Purposes of** *Miranda*

"*Miranda* warnings must be given before a suspect is subjected to custodial interrogation." <u>United States v. Ventura</u>, 85 F.3d 708, 710 (1st Cir.1996).  "The label "custodial interrogation" . . .  is suggestive rather than precise; and the purpose as well as the words inform our understanding." <u>United States v. Teemer</u>, 394 F.3d 59, 65 (1st Cir. 2005).  *Miranda* warnings are intended to provide protection "from coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428, (1984).  "The *Miranda* doctrine functionally aims to protect defendants in situations where, in common experience, isolation and the potential for coercive pressure have been found to exist." (<u>citing</u> <u>New York v. Quarles</u>, 467 U.S. 649, 654 (1984)). "The fearsome squad room interview of an arrestee is the classic case." <u>Id</u>. at 66.

In contrast, "[a]s a general rule, *Terry* stops do not implicate the requirements of *Miranda*." <u>United States v. Streifel</u>, 781 F.2d 953, 958 (1st Cir.1986).  This is so "because ' *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.' " <u>Id</u>. (<u>quoting</u> <u>United States v. Bautista</u>, 684 F.2d 1286, 1291 (9th Cir.1982)).  "Although any restriction on movement might as a literal matter be labeled "custodial," the Supreme Court has flatly rejected such an approach, holding that someone questioned at a routine traffic stop in a non-coercive setting need not be given the *Miranda* warning."  <u>Teemer</u>, 394 F.3d at 66 (<u>citing</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437-40 (1984).

A valid investigatory stop may nevertheless escalate into custody, thereby triggering the

need for *Miranda* warnings, where the totality of the circumstances shows that a reasonable

person would understand that he was being held to "the degree associated with a formal arrest."

Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (internal quotation marks

omitted).  "There is no scientifically precise formula that enables courts to distinguish between

investigatory stops . . . and 'de facto arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1st Cir.

1994).  Instead, the ultimate inquiry is whether there was "a formal arrest or restraint on freedom

of movement of the degree or restraint on freedom of movement of the degree associated with a

formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995)(quoting Berkemer v. McCarty,

468 U.S. 420, 442 (1984)).  "In order to assess the 'restraint on freedom of movement,' a court

must examine all the circumstances surrounding the interrogation."  United States v. Ventura, 85

F.3d 708, 711 (1st Cir. 1996).  This is an objective test: "the only relevant inquiry is 'how a

reasonable man in the suspect's shoes would have understood his situation.'  The subjective

belief's held by the interrogating officer or the person being interrogated are not germane."

Id.(quoting Stansbury v. California, 511 U.S. 318, 324 (1994)).  The defendant bears the burden

of proving custody.  See United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984)(overruled on

other grounds).  Relevant factors include "whether the suspect was questioned in a familiar or at

least neutral surroundings, the number of law enforcement officers present at the scene, the

degree of physical restraint placed upon the suspect, and the duration and character of the

interrogation." Ventura, 85 F.3d at 711 (internal quotation and citation omitted). In this case, an

analysis of the above cited factors demonstrates that a reasonable person in defendant's shoes

would not have believed they were in custody.

### 1.    Defendants Were Interviewed in Neutral, Familiar Surroundings

First, the interview took place in neutral, familiar surroundings: the brightly-lit public parking lot at 290 Quarry Street in Quincy where HUERTA had rented an apartment and a garage under the name Angel Rivera, and from where both defendants had just departed in the white Taurus.  The parking lot was a location familiar to both defendants.  HUERTA had rented an apartment and a garage at the location.  Between May 2005 and July 2005, agents observed both HUERTA and BRITO at this location at various times.  Furthermore, by all accounts the parking lot was extremely large, well lighted, open and accessible to the public.  See 6/6 Tr. 125 (O'Neil); 6/13 Tr. 98 (Kane); 6/14 Tr.39 (Cepero). See United States v. Nishnianidze, 342 F.3d 6, 13-14 (1ˢᵗ Cir. 2003)(defendant not in custody even though the interview took place early in the morning, was administered by three agents in a small area, and defendant, an immigrant from Russia, was never told he was free to leave; defendant was only interviewed for between 30 to 45 minutes in the apartment in which he was residing); United States v. Salvo, 133 F.3d 943, 950-51 (6ᵗʰ Cir. 1998)(defendant not in custody during interview at defendant's "dormitory computer room and the parking lot of the Burger King restaurant–[which] can hardly be said to be hostile or coercive environments"); United States v. Klein, 13 F.3d 1182, 1184 (8ᵗʰ Cir. 1994)(defendant not in custody when interviewed in hospital parking lot because it was similar to a routine traffic stop); see also Michigan v. Summers, 452 U.S. 692, 702 (1981)(detention during legally obtained search warrant of residence is "substantially less intrusive" than detention accompanied by formal arrest."); Beckwith v. United States, 425 U.S. 341, 345-47 (1976)(*Miranda* warnings not required because IRS agents conducted cordial interview of taxpayer at his home).

### 2.    The Number of Law Enforcement Agents Present at the Scene

Second, while there were approximately ten law enforcement agents present at the parking lot at 290 Quarry Street, the only agents that had any type of interaction with the defendants were Troopers Kane, Duane, and Cepero. None of the other plainclothes federal agents or uniformed officers were near or had any contact with defendants at the lot until the discovery of the cocaine in the blue Saab.  Therefore, it cannot be said that any of these other agents/officers were in a position to coerce or influence defendants into speaking with the police. See Illinois v. Perkins, 496 U.S. 292, 297(1990) ("It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation."); see also United States v. Masse, 816 F.2d 809-810 (1ˢᵗ Cir. 1987)(holding that defendant was not in custody when approached by two plainclothes officers who identified themselves and asked to converse with him, though other plainclothes officers were in the area).

Furthermore, the interaction these agents had with the defendants was brief, each lasting less than ten or fifteen minutes.  Trooper Kane obtained identifications from both the defendants and asked HUERTA some basic questions about his travel that evening.  The entire interaction between Trooper Kane and defendants took less than fifteen minutes.  6/13 Tr. 94-96 (Kane). Trooper Duane did not ask defendants any questions. Instead, Trooper Duane advised both defendant that they were not under arrest and advised them of their *Miranda* warnings.  6/14 Tr. 10-12, 29 (Duane).  Finally, Trooper Cepero's interview of defendants lasted five to six minutes. 6/14 Tr. 50 (Cepero).

### 3.    The Degree of Physical Restraint

Third, the degree of physical restraint that was placed upon the defendants was minimal and no more sufficient than necessary to ensure the safety of the law enforcement agents and the defendants.  At the scene of the traffic stop, the defendants were separated from each other as they leaned on the guardrail, but were not placed into handcuffs.  None of the uniformed MSP troopers ever drew or displayed their firearms. Compare United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005)(defendant not in custody during questioning even though officer displayed weapon, frisked and handcuffed the defendant, and kept the defendant in handcuffs after other officers arrived).  Before the State Police transported defendants back to 290 Quarry Street,  Trooper Duane informed defendants that they were not under arrest and informed them of their right to remain silent under *Miranda*.  See 6/14 Tr. 10-12, 29 (Duane).  While it is true that defendant were patted down and were placed in the back of police cruisers with rear doors that automatically locked, the drive back to 290 Quarry Street took only a few minutes. See 6/14 Tr. 19 (Duane).

The only evidence that defendants were required to hold their hands over their heads for a prolonged period of time came from the testimony of defendant HUERTA.[12]  Furthermore, defendant HUERTA's assertion that he did not understand or remember receiving Miranda warnings was not credible.  Although claiming to not understand English, HUERTA was able to understand and respond to Trooper Kane's instructions and questions during the course of the

---

[12]Even more significantly, though defense counsel elicited testimony from HUERTA regarding Trooper Duane's instructions to put his hands locked behind his head for an extended period of time, counsel did not seek to elicit this testimony from Trooper Duane on cross-examination.

23

traffic stop. Moreover, it is even more incredible that HUERTA did not understand and appreciate the significance of a uniformed law enforcement officer, reading from a note card, informing him that he was not under arrest but had the right to remain silent.

### 4.    The Duration and Character of the Interrogation

While a factual dispute does remain, there can be little doubt about the timing of some of the essential facts. First, the actual "interrogation" by Trooper Cepero only lasted five to six minutes. 6/14 Tr. 50 (Cepero); see Ventura, 85 F.3d at 711 (Relevant factors include " . . . the duration and character of *the interrogation*") (emphasis supplied); Nishnianidze, 342 F.3d 6 at13-14 ("The interview was forty-five minutes or less – not exceptionally long."). Furthermore, there is nothing in the record to suggest that Trooper Cepero's interview of the defendant was anything but calm, cordial and conversational.6/14 Tr. 42, 50 (Cepero).

Second, there is little dispute about the time when the investigatory detention began at the scene of the traffic stop. Trooper Kane stopped the white Taurus at approximately **9:40 p.m.** 6/13 Tr. 80 (Kane). The citation Kane wrote-up and gave to HUERTA indicated a time of 9:40 p.m. 6/13 Tr. 80 (Kane); Govt Exhibit No. 24. Third, contrary to defendants' assertions, the booking process for both defendants began at approximately **11:43 p.m.** 6/13 Tr. 135-36 (Kane); Govt Exhibits 26 and 29. The booking process did not begin until Trooper Kane physically transported defendants to the barracks at 125 Day Boulevard in South Boston, and handed defendants driver's licenses to the desk officer. 6/13 Tr. 103, 136-38 (Kane). At that time, a time stamp of "11:43:00 PM" was automatically generated into the booking system by the desk officer. Govt Ex 26 & 29; 6/13 Tr. 135-36 (Kane). This time is further corroborated by the MSP

24

Narcotic Custody Form which indicates a time of incident of "2300" (11:00 p.m.)  Govt Ex 25.

Therefore, any interaction between law enforcement and defendants began at approximately 9:40 p.m. and ended well before 11:45 p.m.  Furthermore, defendants' assertion that Trooper Kane's search of the white Taurus lasted fifty minutes to an hour, based solely on HUERTA's testimony, is incorrect and is contradicted by the turret-tape. Approximately five minutes after Trooper Kane performed the traffic stop of the white Taurus, identified the occupants, and wrote-up a citation, Trooper Kane called for back up and Trooper Duane responded.  6/13 Tr. 94-96 (Kane).  This request for assistance, with "1600" (Trooper Duane), is captured on the fourteen minute turret-tape.  Govt Ex. 27.

Approximately 30 seconds into the turret-tape, Trooper Duane is heard responding (with sirens overheard in the background) to Trooper's Kane's request for backup.  Govt Ex. 27.  At approximately 2:21 on the turret-tape, Trooper Kane is heard instructing Trooper Duane to come behind "slow, no lights."  Id.  At approximately 3:21 on the turret-tape, Trooper Kane is heard instructing another cruiser, "1900," to come to his backside in the "BDL" (break down lane). Id. At approximately 5:30 on the turret-tape, Trooper Duane ("1600") is overheard contacting dispatch to "copy a couple of items," and recites the name Jose Navarro and Hector Colon to run their criminal history.  Id. Before the completion of the fourteen minute turret-tape, Trooper Kane completed his search of the Taurus, reported his findings to Trooper O'Neil, and departed the scene for 290 Quarry Street leaving BRITO and HUERTA with Trooper Duane. 6/14 Tr. 18-19 (Kane).  Therefore, contrary to defendants' assertions, the search of the Taurus could not have lasted longer than fourteen minutes and took only approximately five minutes.

Moreover, while there is some discrepancy between the testimony Trooper Cepero, who testified that he received a call from Trooper O'Neil at either 11:00 or 11:15 p.m. 6/14 Tr. 37, 39 (Cepero), and Trooper Kane and TFA O'Neil, the discrepancy is understandable and inconsequential.  First, Trooper Cepero was not actively involved in the investigation and was asked to interview defendants because he was a native Spanish speaker.  6/14 Tr. 39 (Cepero). Second, although Trooper Cepero testified that he wrote "11:30" on the top portion of his handwritten notes, he also did <u>not</u> testify that the notation signified that the interview began at 11:30. 6/14 Tr. 77.  Instead, Trooper Cepero testified that the notation could have signified the approximate time of either the beginning or end of the interview.  <u>Id</u>.  An approximate interview time of 11:30 is also not wholly inconsistent with a booking time of 11:43 p.m.

Furthermore, defendants' reliance on the Supreme Court's decision in <u>United States v. Place</u>, 462 U.S. 696 (1983) is misplaced.  Contrary to defendant's assertion during oral arguments, <u>Place</u> did not hold that a *Terry* stop cannot last longer than 90-minutes.  <u>See e.g.</u>, <u>United States v. Scheets</u>, 188 F.3d 829, 842 (7th Cir. 1999)(defendant not in custody during encounter with investigating officers that continued for almost three hours).  In <u>Place</u>, the Supreme Court held that though <u>Terry</u> would permit an officer to briefly detain luggage at an airport briefly to investigate a reasonable suspicion, on the facts before the Court, the ninety minute detention of luggage without probable cause was too long.  <u>Id</u>. 709-710.  The Court reasoned that a seizure of luggage from a suspect's personal possession at airport was particularly disruptive because  "such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return."  <u>Id</u>. at 708.  Nonetheless, the Court clearly eschewed an outside time limit for a *Terry*

26

stop since "[s]uch a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." Id. at 709-10, n. 10.

Finally, while it may be true that defendants reasonably believed that they were under investigation, the above cited factors demonstrate that the statements that defendants gave to Trooper Cepero were not the product of "custodial interrogation." See United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005)("While a reasonable person in [defendant's] situation would certainly have understood that he was under investigation for a crime, the stop, given the facts as found by the district court, "lacked the coercive element necessary to convert it into something more draconian," based on the totality of the circumstances.")

**C.    The Continued Investigatory Detention of Defendants Was Justified by Additional Facts Learned During the Course of the Traffic Stop Including HUERTA's Presentation of a Fraudulent Driver's License, BRITO's Illegal Immigration Status, and the Positive Dog Alert to the Blue Saab and Garage #9**

"To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau-the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).

As described in the government's initial opposition, the stop of the White Taurus was justified at its' inception based upon: (1) a motor vehicle infraction witnessed by Trooper Kane; and (2) at least reasonable suspicion that BRITO and HUERTA were engaged in ongoing narcotics activity based on: information from a DEA cooperating source in New York (CS-2) who in November 2004 provided specific information that BRITO was involved in cocaine

27

trafficking in Boston; a federal wiretap conducted between March 25, 2005 until May 19, 2005 which demonstrated that BRITO and HUERTA were actively involved in drug trafficking on an ongoing basis, including the collection of drug proceeds which were kept at 290 Quarry Street; and physical surveillance at 290 Quarry Street. Therefore, there can be no question that law enforcement agents were at least permitted to conduct a brief investigatory detention as part of an ongoing investigation. Furthermore, within minutes of the initial stop of the white Taurus, law enforcement agents learned new facts that justified the continued investigative detention of defendants in order to continue the investigation.

First, agents learned that HUERTA was using a fraudulent New Hampshire license in the name Hector Colon, a name previously unknown to law enforcement. Second, HUERTA falsely stated to Trooper Kane that he had just come from Boston, thereby distancing himself from the suspected stash location from where he and BRITO had just left. 6/13 Tr. 90. Third, before transporting defendants to 290 Quarry Street, Trooper Kane's certified trained drug dog alerted to the blue Saab and Garage #9. It only after Rigg's positive "moonwalk sit" alert to both the Saab and Garage #9 that Trooper Kane instructed Trooper Duane to bring BRITO and HUERTA to 290 Quarry Street. 6/13 Tr. 117. Fourth, given the fact that both BRITO and HUERTA were using fraudulent identifications, the transportation of defendants back to 290 Quarry Street, which only took a few minutes, was necessary to fully identify them and to do so in a safe manner. TFA O'Neil testified:

> **Q:** Now, why was it that you, instead of going to the side
> of the highway to interview Mr. Brito-Melo and Mr. Huerta,
> you decided to bring them back to 290 Quarry Street?
> **A:** Well, safety reasons would be the first. On the side of

28

the highway, I didn't want to cause an accident up there.
The primary place of the investigation was at 290 Quarry
Street.  It's a quiet lot there where the interview could
have been conducted, so we thought it was best if they were
brought back there; as well as the troopers that were up on
the side of the highway weren't able to positively ID either
individual.  They were provided with licenses, but it wasn't
known if they -- I know they weren't provided with a picture
of Brito-Melo prior to that, nor were they provided with a
license of Angel Rivera, who subsequently ID'd himself as
Hector Colon

6/13 Tr. 14-15.

Fifth, during the interview with Trooper Cepero at 290 Quarry Street, HUERTA

purposely provided Trooper Cepero with false information. HUERTA told Trooper Cepero that

his name was Hector Colon and that he was from Puerto Rico, when his true name was RAFAEL

HUERTA from the Dominican Republic. 6/14 Tr. 56-57 (Cepero).  HUERTA stated that he did

not live that 290 Quarry Street, and instead only parked in the lot because he had a friend who

lived in the building in Apartment #704. 6/14 Tr. 46 (Cepero).  At the time, agents knew that

HUERTA had rented *Apartment #705* in the name Angel Rivera, thus again demonstrating that

HUERTA was trying to distance himself from 290 Quarry Street.  Finally, HUERTA told

Trooper Cepero that earlier in the day he had driven not one, but two cars down from New

Hampshire in order to lend one of the cars to his companion, Jose Navarro. 6/14 Tr. 45.  This

statement directly contradicted BRITO's statement to Trooper Cepero that BRITO and HUERTA

(whom he called "Pinto") were going to Brockton to fix a boiler.  6/14 Tr. 52.  HUERTA said

nothing about fixing a boiler.  6/14 Tr. 41-51.  Furthermore, when asked about the parking lot,

29

BRITO claimed to have never been to the parking lot at 290 Quarry Street.  6/14 Tr. 54.

Sixth, at the time of car stop, agents were aware that and had confirmed that the INS had issued an deportation warrant for the arrest of BRITO.  Govt Ex. 6.  Agents were also able to determine that BRITO was using a fraudulent identification in the name of Jose Navarro Concepcion.[13]

Finally, even if court concludes that defendants were in custody at the time of interview by Trooper Cepero, prior to the interview, Trooper Duane advised both defendants of their *Miranda* warnings.  As further described above, before transporting defendants to 290 Quarry Street, Trooper Duane advised both defendant that they were not under arrest and advised them of their *Miranda* warnings.  6/14 Tr. 10-12, 29 (Duane).  As stated above, HUERTA's assertion that he did not understand his *Miranda* rights is not credible.  Morever, while BRITO only spoke Spanish on the wiretap, unlike HUERTA, BRITO had arrived in the United States by at least 1996 when he was ordered deported.  Govt Ex. 6.

**D.     The Consent that HUERTA Gave Trooper Cepero to Search the Blue Saab Was Valid Because It Was Knowing, Intelligent, and Voluntary**

Even if defendants were in custody at the parking lot at 290 Quarry Street, HUERTA gave Trooper Cepero valid written consent to search the blue Saab. "The Fourth Amendment test

---

[13]There is no case law that addresses the issue about whether or not non-immigration officers have the legal authority to arrest a person named in an administrative deportation warrant. For this reason, it government is not relying on the existence of the deportation itself as probable cause for BRITO's arrest, but submits it is a relevant factor to justify continuing BRITO's detention.  Nevertheless, BRITO's use of the identification of another person to commit or aid and abet a federal offense is a violation of 18 U.S.C. Sec. 1028, identity theft, a felony offense.

for a valid consent search is that the consent be voluntary," "a question of fact to be determined

from all the circumstances.' " Ohio v. Robinette, 519 U.S. at 33, 39 (1996)(quoting Schneckloth

v. Bustamonte, 412 U.S. 218, 248-49 (1973); United States v. Romain, 393 F.3d 63, 68 (1st Cir.

2004). Proof of valid consent requires that the prosecution show, by a preponderance of the

evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v.

Perez-Montanez, 202 F.3d 434, 438 (1st Cir.2000). Factors to be considered include age,

education, experience, knowledge of the right to withhold consent, and evidence of coercive

tactics. United States vs. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). Furthermore, "while

sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is

obtained during custody, custody alone has never been enough in itself to demonstrate . . .

coerced . . . consent to search." United States v. Trueber, 238 F.3d 79, 95 (1st Cir. 2001); United

States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000)(reversed in part on *Apprendi*

grounds); United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993)(stating that custody

alone does not create the kind of coercive atmosphere that abrogates consent).

　　　　Here, the written consent that HUERTA gave to Trooper Cepero to search the blue Saab

was knowing, intelligent and voluntary. Trooper Cepero asked HUERTA about the blue Saab

and informed HUERTA that the police wanted to search the Saab. 6/14 Tr. 47-48 (Cepero).

Trooper Cepero asked HUERTA if he would consent to the search. Id. After HUERTA gave

verbal consent, agents went one step further and gave HUERTA a form in Spanish which

described the car to be searched. Id. Trooper Cepero read the form aloud to HUERTA and

HUERTA signed it using the name Hector Colon. 6/14 Tr. 49 (Cepero).

　　　　HUERTA argues that the written consent he provided to MSP Trooper Cepero was not

voluntary because HUERTA was in custody at the time of the consent and had not been advised of his *Miranda* warnings.  See Doc. 58 at 8-9.  Defendant's argument is legally and factually flawed for several reasons.

First, HUERTA was advised of his Miranda warnings and adequately understood them. Although HUERTA seems to ignore the testimony, before HUERTA and BRITO were transported back to 290 Quarry Street, Trooper Duane advised both HUERTA and BRITO of their Miranda rights in English using a *Miranda* warnings card.  6/14 Tr. 10-12, 29 (Duane). Both BRITO and HUERTA indicated that they understood those rights, one with a nod and the other with an audible "yes."  6/14 Tr. 11-12 (Duane).  HUERTA's testimony that he did not understand English and the *Miranda* warnings was not credible.  During his testimony, HUERTA admitted he was able to understand a series of instructions from Trooper Kane's including his request for license and registration. 6/14 Tr. 99, 114.

Second, HUERTA's argument that the failure to give *Miranda* warnings vitiates his consent because he was in custody at the time he gave consent is incorrect as a matter of law. Under the Supreme Court's decision in United States v. Patane, 542 U.S. 630, 643 (2004), the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of a suspect's un-warned but voluntary statements.  This is because Miranda protects an individual's Fifth Amendment right against self-incrimination.  The Fifth Amendment cannot be violated by the introduction of non-testimonial evidence obtained as a result of voluntary statements.  Patane, 542 U.S. at 637, 640.

In Patane, the defendant was arrested and placed into custody during the execution of an

arrest warrant at the defendant's residence for violation of a temporary restraining order.  During

his arrest, upon questioning by the police, the defendant told the police, without being fully

advised of his *Miranda* warnings, about the location of a firearm in his bedroom and gave the

police permission to search his bedroom to seize the firearm.  Id. at 636.  The Tenth Circuit

Court of Appeals ruled that the seizure of the firearm was inadmissible as a violation of Miranda

and Wong Sun.

The Supreme Court overturned the Tenth Circuit's decision and specifically held that the

Fourth Amendment's exclusionary rule does not apply to violations of Miranda.  The Court

reasoned that potential violations of Miranda only occur upon the admission of un-warned

statements into evidence at trial:

> Thus, unlike the unreasonable searches under the Fourth Amendment or actual
> violations of the Due Process Clause or the Self-Incrimination Clause, there is,
> with respect to mere failures to warn, nothing to deter.  There is therefore no
> reason to apply the 'fruit of the poisonous tree' doctrine of Wong Sun.
>
> Patane, 542 U.S. at 642.

HUERTA also cites the Seventh Circuit's decision in United States v. Jerez, 108 F.3d

684, 694-95 (7th Cir. 1997).  In Jerez, the court relied upon the Supreme Court's decision in

Brown v. Illinois, 422 U.S. 590 (1975) for the proposition that an illegal seizure of a suspect

could taint that the voluntariness of that suspect's subsequent consent to search.[14]  Jerez, 108

F.3d at 694-95. However, unlike Patane, Brown v. Illinois simply addressed the admissibility of

testimonial confessions, and did not touch upon the issue of voluntariness of a suspect's consent

---

[14]More specifically, in Brown v. Illinois, the Court held that in-custody statements which
stemmed from an illegal arrest were not rendered admissible merely because defendant had been
given Miranda warnings prior to making statements. Id. at 604-05.

or the admissibility of evidence derived from such consent. Therefore, in light of the Supreme Court's decision in Patane, and the First Circuit's decision in Trueber (further described below), Jerez is no longer accurate law.

Third, defendant strongly suggests that since law enforcement agents had no intention of permitting defendants to leave, Trooper Cepero was required to advise HUERTA of his *Miranda* warnings before seeking his consent. This argument was the same reasoning employed by the District Court which the First Circuit overturned in United States v. Trueber, 238 F.3d 79 (1st Cir. 2001). In Trueber, the District Court suppressed statements the defendant made to the police during the course of a traffic stop. The district court found that the officers had probable cause to arrest the defendant but subjectively had no intention of permitting the defendant to depart the scene, even though the defendant was not in custody. The First Circuit rejected this reasoning and held:

> Evidently, the district court took the view that because the agents were entitled to arrest Trueber and, thus, necessarily intended to arrest him, what occurred when the officers stopped the truck was not a valid *Terry* stop, but a de facto arrest, requiring *Miranda* warnings from the outset. This reasoning improperly conflates the two areas of the inquiry and is based upon a false premise. The subjective intent of the agents is not relevant to either part of the inquiry: it does not impact the validity of the initial investigative stop, and it has no bearing on determining whether police conduct transformed an investigative stop into a de facto arrest.
>
> Trueber, 238 F.3d at 9

Along the same incorrect reasoning, the District Court also ruled that the consent the defendant provided to the police to search his hotel room away from the scene of the traffic stop was invalid because the defendant was in custody. The First Circuit rejected this ruling, stating:

> Because the district court determined that Trueber was in custody when he agreed to accompany the agents back to his hotel room, it treated the issue of consent in a

34

> per se manner: any consent on Trueber's part necessarily was involuntary because he was in custody. This per se rule is invalid. While "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, custody alone has never been enough in itself to demonstrate ⋯ coerced ⋯ consent to search."
>
> Trueber, 238 F.3d at 95, citing United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir.2000).

Finally, HUERTA's argument that his consent was invalid because he was not told he had the right to refuse consent is also incorrect. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." Schneckloth v. Bustamonte, 412 U.S. at 227. The First Circuit has clearly held that in order for consent to be voluntary, "it is not essential that the officers first inform the consenting party of the right to withhold consent." United States v. Esquilin, 208 F.3d 315, 318 (1st Cir. 2000); United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir.1993). Likewise, consent can be voluntary even though a detainee does not feel free to leave. Florida v. Bostick, 501 U.S. 429, 435-36(1991). Similarly, the Fourth Amendment also does not require that a lawfully seized suspect be advised that he is "free to go" before his consent to search will be recognized as voluntary. Ohio v. Robinette, 519 U.S. 33, 35 (1996).

Finally, in addition to valid written consent, prior to the search of the blue Saab, Trooper Kane's certified drug dog, "Riggs" alerted to the rear are of the blue Saab (where the cocaine was found) and Garage #9. To counter this evidence, defendant argues that a dog alert cannot provided probable cause for a search because the dog can only detect the odor of narcotics and cannot, for certain, ever determine that drugs are actually present. This argument fails because several cases have held that a positive dog alert can provide probable cause for a search. See

United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002)(per curiam)(probable cause to search

defendant's trunk after sniff dog alerted to contraband; alert was sufficiently close to trunk);

United States v. Cedano-Arellano, 332 F.3d 568, 573 (9th Cir. 2003)(per curiam)(probable cause

to search defendant's gas tank after narcotics dog alerted to presence of drugs); United States v.

Watts, 329 F.3d 1282, 1286 (11th Cir. 2003)(probable cause to conduct warrantless search based

on multiple positive alerts given to officers by drug dogs).


### III. CONCLUSION

For the reasons set forth above, the government submits that the defendants' motion

should be denied.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Neil Gallagher          
Neil J. Gallagher, Jr.
Rachel E. Hershfang
Assistant U.S. Attorneys


I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and mailed to all those not participating in ECF.

/s/ Neil J. Gallagher, Jr.            
Neil J. Gallagher, Jr.